## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

CALVIN MCCRAW, et al.,                          )
                                                )
                   Plaintiffs,                  )
vs.                                             )          NO. CIV-16-352-HE
                                                )
CITY OF OKLAHOMA CITY, et al.,                  )
                                                )
                   Defendants.                  )

## ORDER

In this case, plaintiffs challenge an Oklahoma City ordinance which bans pedestrian activity on certain city medians.[1] The ordinance applies to medians in city streets having a speed limit of 40 mph or higher, sometimes referred to as "arterial" streets. Plaintiffs seek a declaration that the ordinance violates their First Amendment right to free speech and their Fourteenth Amendment right to liberty. They seek an injunction to prevent its enforcement.[2]

A non-jury trial was held on November 19 and 20, 2018. Having considered the evidence at trial together with the other submissions of the parties, the court concludes the

---

[1] *Ordinance No. 25,777. Plaintiff's Exhibit 21, Oklahoma City, Okla., Mun. Code ch. 32, art. XIII, § 32-458. Page references are to the CM/ECF document and page number or to the trial exhibit.*

[2] *The court previously granted summary judgment on plaintiffs' claims that the ordinance is void for vagueness and violates their equal protection rights. Although plaintiffs allege both a facial and an as-applied First Amendment challenge to the ordinance, their central thrust is a facial challenge to the ordinance. See Doe v. City of Albuquerque, 667 F.3d 1111, 1122 (10th Cir. 2012); see also iMatter Utah v. Njord, 774 F.3d 1258, 1263-64 (10th Cir. 2014) ("'A facial challenge considers the restriction's application to all conceivable parties, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case.'") (quoting Colo. Right To Life Comm. v. Coffman, 498 F.3d 1137, 1146 (10th Cir.2007)).*

ordinance is constitutional as against the challenges asserted here.  The following findings of fact and conclusions of law state the basis for the court's conclusion.

Factual background

In 2015, Oklahoma City's Municipal Code prohibited pedestrians from soliciting while standing in the roadways unless they had a permit.  *See* plaintiffs' Exhibit 17.  With a permit, individuals could walk from a median or sidewalk into the road to solicit, provided they did not impede traffic and remained there only so long as the traffic signal prohibited vehicle movement.  *Id*.  For years Oklahoma City firefighters relied on that exemption while engaging in their annual Fill the Boot campaign for the Muscular Dystrophy Association.   Other individuals and groups also used city medians for a variety of purposes, including community fundraising, political campaigning, and panhandling activities.

In December of 2015 the Oklahoma City Council passed the first of two ordinances restricting pedestrian activity on city medians.[3]  The ordinance was essentially a city-wide median ban.  It prohibited pedestrians from standing, sitting, or staying on any section of a median which was less than 30 feet in width and and located within 200 feet of an intersection, for any purpose other than crossing the road.  The revised ordinance did not include the prior permit exemption for soliciting in the roadway, but did include limited

---

[3] *Under state law, Oklahoma municipalities are authorized to "regulate and control the streets, road, and other public ways within the limits of the municipality."  11 Okla. Stat. § 36-101(1).  They may enact "ordinances and regulations governing the operation of motor vehicles and traffic upon the roads and streets within the municipality."  Id. at § 22-117.*

exceptions for access by public employees, emergency uses, and certain other purposes. Plaintiffs' Exhibit 19.

The 2015 ordinance originated in response to a number of complaints one council member had received from citizens and businesses regarding "panhandling."  On occasion, the mayor or others made reference to the "panhandling issue" as the matter being addressed by the City.  Plaintiffs' Exhibits 37, p. 3; 36, pp. 6-7.  In a statement to a local paper,[4] the council member described the proposed changes to the city code as part of an effort to combat the "'explosive' growth in activities that frighten and intimidate many residents."  Plaintiffs' Exhibit 16.

The ordinance was introduced at a September 15, 2015, city council meeting and discussed at a public hearing held two weeks later.[5]   During the hearing, the municipal counselor's office contended the proposed ordinance should be viewed as one addressing public safety and was "not necessarily about panhandlers."  Plaintiffs' Exhibit 37, p. 3.  An assistant city attorney explained that anyone who was on a median, regardless of whether they were panhandling or holding a campaign or car wash sign, was in danger.  He suggested that medians had never been meant to be places for public debate, but had

---

[4] *The exhibit was admitted without objection and, regardless, the statement does not constitute hearsay as it is not being considered for the truth of the matter asserted.*

[5] *The 2015 ordinance went through several drafts.  The initial draft added the definition of median and extended the City's existing ban on solicitation of motorists by pedestrians standing in the roadways to include pedestrians standing or walking on any median.  It repealed the exception which allowed solicitation if a permit had been obtained.  Plaintiffs' Exhibit 17.  The second draft prohibited standing, sitting or staying on any street, highway or median for any purpose and included both a section stating the purpose of the ordinance and an exception for people crossing the street or highway, public workers and emergencies.  Plaintiffs' Exhibit 18.*

"always been a traffic divider." *Id.*, p. 4.  The attorney noted that panhandling per se was not being banned by the proposed ordinance, as it would still be permissible on sidewalks and on the side of the road, just not on the designated portions of medians. The attorney alluded to 14 pedestrians having been killed in Oklahoma City in 1014 and to 11 at that point in 2015, but indicated he did not know where the fatalities occurred.

At the third and final council meeting regarding the ordinance, Chief of Police Citty made a "Traffic Safety Presentation."[6]  It included statistics regarding city-wide collisions between January 1, 2010 and September 29, 2015.  During that period there were approximately 40,000 accidents.  Approximately 16,000 of those involved injuries or fatalities.  And of those injuries or fatalities, approximately 12,000, or 76% of them, occurred near intersections.

The police chief also showed slides/photographs of damaged medians and accidents where vehicles ended up on or crossing the median.  He did not, though, have specific evidence pertaining to pedestrians.  He stated that a number of the accidents involved pedestrians, but he did not know the exact number which, he said, would not be "very high." Defendants' Supplemental Exhibit 54, p. 10.  The police chief indicated it had been the police department's position for many years that pedestrian activity on medians was dangerous, noting that the median was a high-risk area for people to use due to exposure

---

[6] *At the suggestion of an assistant city manager, the police chief changed the title of his presentation from "Panhandler Presentation" to "Traffic Safety Presentation."  Plaintiffs' Exhibit 15.*

4

to traffic "going a lot of different ways."[7]  *Id.* at p. 17. At least two city councilmen were skeptical whether the accident statistics and safety rationale justified the ordinance, *see id.* at pp. 19-20; 24, but the ordinance passed by a 7-2 vote on December 8, 2015.

In April 2016, plaintiffs filed this case challenging the ordinance, claiming that it violated their First and Fourteenth Amendment rights.  Plaintiffs are individuals and entities who use and have used city medians for a variety of purposes.  Also in April 2016, the city council amended the City's Aggressive Panhandling Ordinance, No. 25,359, to expand panhandling free zones.[8]

In October of 2017, after the first ordinance had been in effect for almost two years, the City considered a new median ordinance which focused on the authorized speed limit for the adjacent roadway, rather than proximity to an intersection.  An assistant city attorney presented the proposed ordinance at a city council meeting.  She indicated the City had conducted more study and research to determine what was the highest risk factor for pedestrians who remained on medians for longer than the time required to cross the street.[9] She indicated, based on National Highway Traffic Safety Administration ("NHTSA")

---

[7] *Police Chief Citty stated that the police department had, eight to ten years previously, recommended a city ordinance banning people from the medians for public safety reasons because they are designed to separate traffic.  Defendants' Supplemental Exhibit 54, p. 20.*

[8] *The amended ordinance expanded existing panhandling-free zones and created new ones, including a zone within 50 feet of any mass transportation stop.  The amendment was apparently intended to address safety concerns involving students, particularly elementary students, at or near city schools.  The Aggressive Panhandling Ordinance is not challenged in this lawsuit.*

[9] *Part of the research it conducted included meeting with Master Sgt. Brian Fowler, an Oklahoma City police officer and accident reconstructionist, regarding pedestrian safety on medians.*

statistics, the answer was vehicles traveling at a high rate of speed.   According to the NHTSA, the fatality rate of pedestrians involved in an accident with vehicles traveling at 40 mph is 85 percent, compared to 45 percent at 30 mph and 5 percent at 20 mph.   The Centers for Disease Control and Prevention had also reported that vehicle speeds increased both the likelihood of pedestrians being struck by a motor vehicle[10] and the severity of their injuries. The attorney stated that drivers' reaction times decrease with speed.   She also suggested that drivers are now more distracted daily, due to texting or talking on cellular phones.   The attorney also cited other NHTSA statistics regarding the average number of pedestrian deaths a day in traffic accidents (192) and said that Oklahoma City's own statistics showed an increase in the number of pedestrians killed in auto-pedestrian accidents between 2014 and 2015.[11]   She indicated that the City, presumably the municipal staff, had concluded that restrictions focused on the speed of traffic adjacent to the median more appropriately addressed the risks to pedestrians.   The revised ordinance, which is the one now at issue in this case, was unanimously adopted by the city council on November 7, 2017.

The revised ordinance, Ord. No. 25,777, (the "Ordinance" hereafter) recited various findings which stated the council's purported basis for its adoption, and explicitly

---

[10] *Although the transcript reported "being struck by a <u>motorcycle</u>," it is clear that is a mistake and the correct word is motor vehicle.  Defendant's Supplemental Exhibit 578, p. 6.*

[11] *Between 2012 and 2017 there were 504 accident auto-pedestrian reports in Oklahoma City.  Over half (293) resulted from pedestrians being struck in the roadway.  See Plaintiffs' Exhibit 31.*

recognized the constitutional issues potentially implicated by it.   The Ordinance provides as follows:

§ 32-458. - Standing, sitting, or staying on streets, highways, or certain medians.

(a) Findings. The City Council enters the following findings:

(1) Regardless of the speed limit, individuals who are sitting, standing or staying in streets or highways open for use by motor vehicles are placing themselves in danger of serious bodily injuries or death from motor vehicles using such streets or highways; and

(2) National studies have shown a strong correlation between higher motor vehicle speeds and fatal injuries to pedestrians; and

(3) The Center for Disease Control and Prevention has reported that higher motor vehicle speeds increase both the likelihood of a pedestrian being struck by a motor vehicle and the severity of the injury; and

(4) According to the Federal Highway Administration, a pedestrian hit by a motor vehicle at 40 miles per hour (mph) has an 85 percent chance of fatality, compared to 5 percent at 20 mph and 45 percent at 30 mph; and

(5) Consequently, individuals who are sitting, standing or staying on medians located in streets or highways with a speed limit of 40 mph or greater that are open for use by motor vehicles are placing themselves in grave danger of grievous bodily injuries or death from motor vehicles using such streets or highways; and

(6) According to the US Department of Transportation National Highway Safety Administration, in 2015 there were 192 pedestrians injured per day in traffic accidents; and on average, a pedestrian was killed nearly every 1.6 hours and injured more than every 7.5 minutes in traffic crashes in 2015; and

(7) In 2015, pedestrian deaths accounted for 15 percent of all traffic fatalities, and 90 percent of the pedestrians were killed in traffic crashes that involved single vehicles; and

(8) 19 percent of the pedestrians killed in 2015 were struck in crashes that involved hit-and-run drivers; and

(9) Furthermore, individuals who are sitting, standing or staying in such streets or highways or on such medians create additional distractions for the operators of

motor vehicles using such streets or highways; and

(10) Accordingly, the owners and/or operators of motor vehicles in such streets or highways that are involved in collisions with any such individuals are placed at serious and significant risk of possible criminal and/or civil litigation and/or liability; and

(11) Based on findings (a)(1) through (a)(10) above, the City Council wishes to enact this section to:

    i.    Limit as much as possible the number of individuals sitting, standing or staying in streets or highways that are open for use by motor vehicles; and to further

    ii.    Limit as much as possible the number of individuals sitting, standing or staying on medians located in streets or highways with a speed limit of 40 mph or greater that are open for use by motor vehicles; and

(12) The City Council further finds that, notwithstanding the restriction imposed by this section on the use by individuals of medians located in streets or highways with a speed limit of 40 mph or greater, scores of medians exist throughout the limits of the City that are located in streets or highways with a speed limit of less than 40 mph and all such medians may be available for unrestricted use by individuals.

(b) Intent. This Ordinance is not intended to impermissibly limit an individual's right to exercise free speech. Rather it seeks to impose a regulation that is narrowly tailored to protect pedestrians and drivers alike by imposing a specific place and manner restrictions for certain places where substantial threats of grievous bodily injury or death exist due to vehicular traffic traveling at high speeds.

(c) Except as permitted by Subsection (e) of this section, no individual shall stand, sit, or stay for any purpose in any portion of a street or highway open for use by vehicular traffic.

(d) Except as permitted by Subsection (e) of this section, no individual shall stand, sit, or stay for any purpose on any portion of a median located within a street or highway open for use by vehicular traffic if the posted speed limit for such street or highway is 40 mph or greater; provided, if no speed limit is posted for such street or highway, then for the purpose of applying the restrictions imposed by this subsection, the speed limit of such street or highway shall be presumed to be 25 miles per hour.

(e) Subsections (c) and (d) of this section shall not apply to:

(1) Individuals using a crosswalk or safety zone to cross from one side of the street

or highway to another;

(2) Government law enforcement officers, other government employees, or government contractors or their employees or subcontractors who are present in the street or highway or on the median for the purpose of acting within the scope of governmental authority;

(3) Individuals conducting legally authorized construction or maintenance work, or other legally authorized work, in or on the street, highway, or median; or

(4) Individuals responding to any emergency situation.

(f) Any person who violates the provisions of this section shall, upon conviction, be punished by a fine not to exceed $100.00. No court costs shall be assessed.

Oklahoma City, Okla., Mun. Code ch. 32, art. XIII, § 32-458.

The Ordinance essentially prohibits anyone from using a city median for any purpose other than to cross the street, if the adjacent street speed limit is 40 mph or higher. It affects approximately 400 medians in the City.  The City asserts that least 103 medians located in roadways at intersections controlled by traffic lights or stop signs remain available for use under the Ordinance.  However, the number available to users is actually less than that because some of those medians, 27 according to plaintiffs, fall within the scope of the Aggressive Panhandling Ordinance referenced above.[12]

Plaintiffs contend the Ordinance, like the 2015 ordinance, is unconstitutional because it unlawfully restricts protected speech and activities in traditional public fora, contrary to the First Amendment.  They also contend it violates their Fourteenth Amendment Due Process rights by restricting their liberty interests.  Defendants dispute

---

[12] *The total number of medians in Oklahoma City was not specified by the parties, although the City introduced a map which identified all the medians.  Defendants' Exhibit 21.*

whether street medians should be considered traditional public fora and contend that, even if they are, the restrictions involved in the Ordinance pass constitutional muster.

## Discussion / Conclusions of Law

The First Amendment guarantees the right to free expression and is applicable to the states through the Due Process Clause of the Fourteenth Amendment." iMatter Utah v. Njord, 774 F.3d 1258, 1263 (10th Cir. 2014); Cutting v. City of Portland, 802 F.3d 79, 81 (1st Cir. 2015). "Although '[t]he First Amendment literally forbids the abridgment only of "speech,"' courts have "'long recognized that its protection does not end at the spoken or written word. . . . [C]onduct may be sufficiently imbued with elements of communication to fall within the scope of the First ... Amendment[ ].'" Satawa v. Macomb Cty. Rd. Comm'n, 689 F.3d 506, 517 n.11 (6th Cir. 2012) (quoting Texas v. Johnson, 491 U.S. 397, 404 (1989)). "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).

To prevail on their First Amendment claim, plaintiffs initially must "establish that their activities are protected by the First Amendment." Verlo v. Martinez, 820 F.3d 1113, 1128 (10th Cir. 2016). The court then "identif[ies] whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First Amendment activities within the forum." Id. Finally, the court decides "whether the proffered justifications for prohibiting speech in the forum satisfy the requisite standard of review." Id.

10

The Ordinance affects medians on streets where the speed limit is 40 mph or above. The majority of streets in Oklahoma City (983 out of 1029) with that speed limit are classified as major or minor arterial streets.  Major or minor arterial streets are "traffic moving streets," or streets which typically involve higher volumes of traffic.  Medians primarily are designed to serve as traffic control devices on these streets, to separate opposing lanes of traffic.  They also allow pedestrians to cross the road safely.  However, some medians in Oklahoma City have historically been used for other purposes by plaintiffs and others.  Political candidates or their supporters gather in the medians on election day, waiving signs and urging drivers to vote for their candidate.  Political signs, although illegal on public property in Oklahoma City,[13] have also been placed on the medians.  Certain of the plaintiffs have panhandled from city medians or have used them to sell/distribute The Curbside Chronicle, a monthly magazine or "street paper" which provides employment opportunities for people experiencing homelessness.  One plaintiff is a social and political activist who has used medians for political purposes, including political rallies and protests.  Members of the Oklahoma Libertarian Party have used the medians for soliciting signatures seeking ballot access.  And the news media sometimes conduct interviews on medians, or otherwise cover stories from that location.

Most of the activities plaintiffs have engaged in, such as political campaigning or canvassing for voter signatures, are plainly the type of conduct protected by the First Amendment.  *See e.g.,* McCullen v. Coakley, 134 S.Ct. 2518, 2536 (2014) ("'[n]o form of

---

[13] *See Oklahoma City, Okla., Mun. Code ch. 3, art. V, §§ 3-103; 3-82(36).*

speech is entitled to greater constitutional protection" than "'[h]anding out leaflets in the advocacy of a politically controversial viewpoint'") (quoting <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 347 (1995)).  Similarly, "panhandling and solicitation of charitable contributions are protected speech." <u>Reynolds v. Middleton</u>, 779 F.3d 222, 225 (4th Cir. 2015); *see* <u>Cutting</u>, 802 F.3d at 81.[14]  The court therefore concludes plaintiffs have shown they were engaged in expression protected by the First Amendment when they were sitting, standing or staying on city medians, and defendants do not contend otherwise.

"By prohibiting [persons] from accessing the City's [medians], the City has precluded plaintiffs from exercising their First Amendment rights "in a particular government forum." <u>Doe v. City of Albuquerque</u>, 667 F.3d 1111, 1128 (10th Cir. 2012). "To determine when and to what extent the Government may properly limit expressive activity on its property, the Supreme Court has adopted a range of constitutional protections that varies depending on the nature of the government property, or forum." <u>Verlo</u>, 820 F.3d at 1129; <u>First Unitarian Church of Salt Lake City v. Salt Lake City Corp.</u>, 308 F.3d 1114, 1124 (10th Cir. 2002) (nature of relevant forum determines "[t]he extent to which government may control expressive activities").  The Supreme Court has identified three categories of government property: "(1) traditional public fora ('streets and parks which

---

[14] *The court has considerable doubt whether plaintiff Wilson's participation in the Memorial Marathon constitutes expressive conduct for Free Speech purposes.  Similarly, it is doubtful whether plaintiff Faulk's efforts to retrieve his cat from the median would qualify as expressive activity, no matter how expressive the cat may have been.  But plaintiff Faulk, like the plaintiffs generally, has otherwise engaged in sufficient expressive conduct to give him standing to challenge the Ordinance.*

have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions'); (2) designated public fora ('public property which the State has opened for use by the public as a place for expressive activity'); [] (3) nonpublic fora ('[p]ublic property which is not by tradition or designation a forum for public communication')." Doe, 667 F.3d at 1128 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983)).[15]

"[T]raditional public fora are areas that have historically been open to the public for speech activities." McCullen, 134 S.Ct. at 2529. Property is a public forum "[i]f the objective, physical characteristics of the property at issue and the actual public access and uses that have been permitted by the government indicate that expressive activity would be appropriate and compatible with those uses." First Unitarian Church, 308 F.3d at 1125 (quoting Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 698-99 (1992) (Kennedy, J., concurring in judgment)).

Although the cases have generally treated medians as traditional public fora, that conclusion is neither obvious nor, for at least some medians, true at all. Medians come in different shapes and sizes. A median may be twenty or more feet wide, with grassy open areas, or it may be a two-foot-wide strip of concrete. While the City has allowed the public to access and use medians for expressive activities in some circumstances, the "objective,

---

[15] *The court noted in* City of Albuquerque *that the Supreme Court has "since identified a separate category -- the 'limited public forum' – although the Court's use of this term has been inconsistent."* City of Albuquerque, *667 F.3d at 1128.*

physical characteristics of the property" are sometimes incompatible with those uses.  The medians at issue here are located in the middle of busy roadways.  Their primary purpose is traffic control.

Though some medians can be significant in size, most are considerably less accessible than the streets, sidewalks and parks ordinarily viewed as "traditional public fora."[16]  *Id.*  Cases referring to streets as "quintessential public forums" originate from an earlier time when "streets" were less busy and dangerous to pedestrians than the arterial streets in high traffic areas where the medians at issue here are located.

An exceptional type of "median" addressed by the parties involves the very wide medians located north and south of the State Capitol, on Lincoln Boulevard.  Those have been used for protest marches and other political gatherings, and have sidewalks placed on some of them, along with benches, signs and other improvements consistent with pedestrian use. However, the court concludes the medians on Lincoln Boulevard (also known as State Highway 0) are not impacted by the ordinance, as they fall within the direct control of the State of Oklahoma, rather than the City.  *See* 73 Okla. Stat. §§ 83; 83.1.[17]

Despite the distinctions between medians and property considered "classic traditional public fora," Cutting, 802 F.3d at 83, most courts have concluded that public

---

[16] *And as the Tenth Circuit noted in* Verlo, *"[t]he Supreme Court has also cautioned, however, that not all streets and sidewalks are traditional public fora."* Verlo, *820 F.3d at 1138.*

[17] *Certain of the other medians referenced by plaintiffs as being similar to a park, such as McMechan Parkway, are not affected by the ordinance because they are also within the "Capitol-Medical Center Improvement and Zoning District" or are adjacent to streets with speed limits below 40 mph.*

medians are "traditional public fora." <u>Reynolds</u>, 779 F.3d at 225; *see e.g.,* <u>Warren v. Fairfax</u> <u>Cnty.</u>, 196 F.3d 186, 194-98 (4th Cir.1999) (*en banc*); <u>Satawa</u>, 689 F.3d at 520–22.   A critical factor in determining the existence of a public forum is "'whether, by long tradition the property has been devoted . . . to assembly and debate.'"  <u>First Unitarian Church</u>, 308 F.3d at 1124 (quoting <u>Ark. Educ. Television Comm'n v. Forbes</u>, 523 U.S. 666, 677 (1998)); *see* <u>McCullen</u>, 134 S.Ct. at 2529 ("In short, traditional public fora are areas that have been historically been open to the public for speech activities.").  Here, in light of the undisputed evidence that at least some of the medians at issue have been used for expressive purposes and in light of the City's acquiescence in those uses, the court concludes that a substantial number of the medians subject to the Ordinance qualify as traditional public fora.[18]

"[T]he government's ability to restrict speech in [a traditional public forum] is 'very limited,'" *id*. (quoting <u>United States v. Grace</u>, 461 U.S. 171, 177 (1983)), as "the guiding First Amendment principle that the 'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content' applies with full force." *Id*. (quoting <u>Police Dept of Chicago v. Mosley</u>, 408 U.S. 92, 95 (1972)).  In such forums the government generally "may not 'selectively . . . shield the public from some kinds of speech on the ground that they are more offensive than others.'"  *Id*. (quoting <u>Erzonznik.</u> <u>v. Jacksonville</u>, 422 U.S. 205, 209 (1975)).  Courts have, though, "afforded the government somewhat wider leeway to regulate features of speech unrelated to its content."  *Id*

---

[18] *In light of the court's conclusions as to the propriety of the restrictions employed by the City, discussed below, it is unnecessary to identify which particular medians would or would not qualify as traditional public fora. See generally <u>Frisby v. Schultz</u>, 487 U.S. 474, 480-81 (1988).*

"'[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id.* (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  If the restrictions on speech are content-based, they "'must satisfy strict scrutiny, that is, the restriction[s] must be narrowly tailored to serve a compelling government interest.'" Verlo, 820 F.3d at 1134 (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009)).

Here, the court concludes the Ordinance is content neutral.  A law is content based, i.e. not content neutral, if it "applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, 135 S.Ct. 2218, 2227 (2015). The Ordinance at issue here does not discriminate in that fashion.  Rather, it bans sitting or standing in the affected medians by everyone, regardless of the type of "speech" involved. Enforcement authorities do not have to "'examine the content of the message that is conveyed to determine whether' a violation has occurred." McCullen, 134 S.Ct. at 2518. So, on its face, the Ordinance is content neutral. *See* Cutting, 802 F.3d at 86 (ordinance prohibiting standing, sitting or staying on city medians, which "restrict[ed] speech only on the basis of where such speech takes place" is content-neutral).

Plaintiff's contend that, notwithstanding the Ordinance's facial neutrality, it is nonetheless content based based on the motivation of the city council.  They argue the legislative history shows the true purpose to be suppression of panhandling.  They also

contend the City revised the initial ordinance "in response to litigation rather than genuine traffic safety concerns." Doc. #131, p. 34.[19]  Plaintiffs thus ask the court to ignore the explicit rationale and statement of legislative intent included in the ordinance, and to conclude the real reason was something different.

The court declines to do so.  As a threshold matter, it is at least open to question whether, in a First Amendment Free Speech case, the court should even attempt inquiry into the "real" legislative intent.  There is long standing precedent that legislation is generally presumed to be valid and, if otherwise constitutional, will not be struck down "on the basis of an alleged illicit legislative motive."  United States v. O'Brien, 391 U.S. 367, 383 (1968); see Adams Outdoor Advert. Ltd. P'ship v. City of Madison, 2018 WL 3242282, at *3 (W.D. Wis. July 3, 2018) ("The Supreme Court and the Court of Appeals for the Seventh Circuit have repeatedly explained that legislators' personal motivations for enacting a regulation are irrelevant to First Amendment challenges to government regulations; only the government's asserted justifications are pertinent.").

"[T]he Supreme Court has considered legislative motive or purpose in assessing whether a statute is valid under the Establishment Clause and the Equal Protection Clause." Planned Parenthood of Kan. and Mid-Mo. v. Moser, 747 F.3d 814, 841 (10th Cir. 2014),

---

[19] *Plaintiffs make the additional argument that the Ordinance is content-based in application as it allows private businesses and other organizations to landscape and maintain the medians and erect signs advertising their sponsorship.  They do not, though, cite any authority that suggests that conclusion under similar facts.  The court is not persuaded that the limited exceptions for law enforcement personnel or persons maintaining the median are sufficient to demonstrate selective enforcement of the ordinance. The workers are not engaging in protected expression when installing or maintaining the landscaping.*

*abrogated on other grounds*, <u>Armstrong v. Exceptional Child Center, Inc.</u>, 135 S.Ct. 1278 (2015); *see* <u>Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Comm'n</u>, 138 S.Ct. 1719, 1730 (2018) ("Members of the Court have disagreed on the question whether statements made by lawmakers may properly be taken into account in determining whether a law intentionally discriminates on the basis of religion."). And it has suggested that a government-imposed restriction might violate the First Amendment if it was "impermissibly motivated by a desire to suppress a particular point of view." <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 812-13 (1985). But, as the Tenth Circuit pointed out in <u>Moser</u>, the Court has not "invalidated a statute containing no explicit restriction on speech (or expressive conduct) or association on the ground that the 'motive' of the legislature was to penalize a person for the person's speech or association." <u>Moser</u>, 747 F.3d at 842. *See* <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 292 (2000) ("As we have said before, however, this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive."); *see generally* <u>NAACP v. City of Philadelphia</u>, 834 F.3d 435, 449 n.7 (3rd Cir. 2016) ("some courts appear to say that motive is not enough and that there must be evidence that the restriction is being implemented in a discriminatory way"). In <u>O'Brien</u> the Supreme Court explained why courts are reluctant to inquire into legislators' reasons for their actions: "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . ." <u>O'Brien</u>, 391 U.S. at 384. And what motivates some or all at one point is not necessarily what motivates them later.

Further, even if the court was inclined to inquire into the "true" legislative motive, the court would conclude plaintiffs have not established the necessary "illicit" motive as a matter of fact.  It is true that concerns with panhandling triggered the initial discussions and actions by at least some members of the city council.  There is also evidence suggesting that the City's attorneys recognized the potential constitutional questions involved and encouraged evaluating the matter as a public safety issue rather than a panhandling concern.  However, the evidence also suggests that concerns with traffic safety emerged relatively early in the process as a consideration for at least some members of the council.  For example, in September 2015, one council member stated: "it's becoming a public safety issue, and somebody's going to get hurt if we don't do something about it soon." Plaintiffs' Exhibit 36, p. 18.[20]  Another said at the Dec. 8, 2015, city council meeting: "I think it certainly improves safety by getting them off the median at least onto the side of the road . . . especially in certain areas where the speed limit is 40, 45 miles an hour . . .").  Defendants' Supplemental Exhibit 54, p. 114.  The evolution of the various ordinances and drafts, and the comments at the various council meetings and public hearings held, reflect an increasing focus on traffic safety as the council's deliberations continued regarding the issue after the passage of the initial ordinance.  The fact that the ordinance limited its restrictions to medians also cuts against a conclusion that the city council's real intent was

---

[20] *The court recognizes that the same councilman was aware of the possibility of litigation, see plaintiffs' Exhibit 14, but he remained consistent in his position that medians were dangerous and that the City's intent was to protect public safety.  See defendants' Supplemental Exhibit 54, pp. 53-54 (Dec. 8, 2015 city council meeting transcript).  And, as noted, he was not the only member to voice that concern.  See id., p. 114.*

to ban panhandling.  If that was the objective, the ban would likely have been extended to sidewalks adjacent to the streets where it also occurs.  In addition, there has been no evidence of selective enforcement.    And, finally, unlike its predecessor, the Ordinance passed unanimously.

As noted above, it is uncertain whether legislators' personal motivations for enacting an ordinance are even pertinent in evaluating a Free Speech challenge. *See* Moser, 747 F.3d at 842 ("[W]e would be most reluctant to expand the statutory-motive cases to the arena of freedom of speech and association.").  But even assuming they are, the court concludes there is no persuasive basis here for concluding the council's motivation was other than what it recited in the Ordinance itself.  There is nothing improper, or even suspect, about a legislative body considering multiple courses of action for a variety of reasons.  There is nothing wrong with being mindful of constitutional concerns as it elects among options; indeed, doing otherwise might be more problematic.  There is nothing inherently suspicious about a legislative body's approach to a problem changing with experience and as the issue is considered more fully, particularly where the legislative approach and conduct plays out over a course of several years.  In any event, the court concludes there is no basis here for concluding that the Ordinance is anything other than content neutral.

Because the ordinance is content neutral, the court applies an intermediate scrutiny analysis.  To survive a constitutional challenge the ordinance must be narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication. McCullen v. Coakley, 134 S. Ct. at 2529; *see* Njord, 774 F.3d at 1267 (test

applied to determining constitutionality of state regulations authorizing parade permits on state highways).   "The City has the burden of proof in this inquiry." Doe, 667 F.3d at 1131; Reynolds, 779 F.3d at 226, citing McCullen, 134 S.Ct. at 2540.

Promoting public safety in the traffic context is a legitimate, important interest. *See* McCullen, 134 S.Ct. at 2435 (recognizing "the legitimacy of the government's interests in ensuring public safety and order [and] promoting the free flow of traffic on streets") (internal quotation marks omitted); Cutting, 802 F.3d at 86; iMatter Utah, 774 F.3d at 1266; Reynolds, 779 F.3d at 228 (noting government generally was not required "to present evidence to show the existence of a significant governmental interest; common sense and the holdings of prior cases have been found sufficient to establish, for example, that the government has a significant interest in public safety.").   Plaintiffs do not dispute that public safety is a legitimate, significant government interest.   What they essentially argue is that the council was not really worried about the public safety consideration, the argument dealt with above, and the further contention that the ordinance does not really serve to protect pedestrians or others.

Part of plaintiff's argument as to the latter factor is based on the assertion that the City lacked empirical research as the basis for its public safety concerns and, ultimately, adoption of the Ordinance.   The argument is unpersuasive.   It does not take expert testimony or empirical evidence to support a conclusion that traffic is more dangerous at high speeds than at low speeds.   Nor does it take such evidence to conclude that the risk to pedestrians is greater if traffic is speeding past them on two sides rather than one. Notwithstanding that, the council did have available to it (and apparently relied on) various

accident statistics showing the shifting risks to pedestrians based on vehicle speed.  It had the longstanding opinion of its police chief as to the dangers of pedestrian activity on center medians.  *See* defendants' supplemental Exhibit 54, pp. 16, 17.  Even one of the plaintiffs testified he had seen someone drive a vehicle onto a median due to a distracted driver.  Doc. #158-7, p. 6.  While the City did not cite any vehicle accidents involving a pedestrian on a median, "[t]he fact that a pedestrian ha[s] not yet been hit . . . [does] not mean that it [is] not dangerous, for a 'government need not wait for accidents to justify safety regulations.'" Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge, 775 F.3d 969, 975 (8th Cir. 2014) (quoting Assoc. of Comm. Orgs. for Reform Now v. St. Louis Cnty., 930 F.2d 591, 595 (8th Cir.1991)).

Here there was evidence of increasing pedestrian activity on medians located at intersections, coupled with a description by the city police chief of "potential dangers associated with that activity."  Reynolds, 779 F.3d at 229. Similar evidence, when "considered along with a healthy dose of common sense" has been found sufficient to show that an ordinance banning solicitation on medians furthered the county's safety interests. Reynolds, 779 F.3d at 229-30.  The court in Reynolds did not require proof of injuries or accidents involving roadway solicitors because the county had established that roadway solicitation was dangerous and, once it accepted that, it was apparent that the ordinance furthered the county's safety interests.  This court agrees with the Fourth Circuit that "common sense and logic" support the conclusion that removing pedestrians from medians located next to high-speed streets "reduces the number of people engaging in a dangerous

activity and thus furthers the [City's] safety interest in a direct and material way." *Id.* at 230.

The protection of pedestrians was not the only objective sought to be advanced by the City. The Ordinance was also directed to activities on the median distracting drivers and leading to vehicle accidents. Ordinance, subsections (a) (9) and (10). Much of plaintiffs' evidence was to the effect that they wanted to conduct their political or other activities on the median precisely because they could better get the attention of drivers from that vantage point. While that is no doubt true and makes their preference for the median understandable, it also proves the point that --- if the concern is avoiding distractions to drivers --- median activity is very distracting. Again, it does not take expert analysis to reach the conclusion that drivers facing lots of distractions, whether from people on the median seeking their attention or otherwise, are more apt to be involved in traffic accidents.

To satisfy the requirement of narrow tailoring, the ordinance must promote "'a substantial government interest that would be achieved less effectively absent the regulation, and . . . not burden substantially more speech than is necessary to further the government's legitimate interests.'" Verlo, 820 F.3d at 1134 (quoting Wells v. City & Cnty. of Denver, 257 F.3d 1132, 1148 (10th Cir. 2001)). The time, place or manner restriction does not have to "'be the least restrictive or least intrusive means'" of advancing its legitimate goals. iMatter Utah, 774 F.3d at 1266 (quoting Ward, 491 U.S. at 798-99). As explained by the Tenth Circuit in iMatter Utah, restrictions on protected speech "'are not invalid simply because there is some imaginable alternative that might be less burdensome on speech.'" *Id*. (quoting Ward, 491 U.S. at 798). All that is required is that

the restriction on speech be reasonably targeted, not perfectly targeted, "'to address the harm intended to be regulated.'"  *Id.* (quoting 44 Liquormart, Inc. v. Rhode Island, 571 U.S. 484 (1996)).  Here, the court concludes the Ordinance, with its focus on higher speed arterial streets, is reasonably focused on the pedestrian and traffic safety objectives identified by the City.

Plaintiffs also contend defendants have failed to "demonstrate that alternative measures that burden substantially less speech would fail to achieve the [City's] interests." McCullen, 134 S.Ct. at 2540.  In their proposed findings and conclusions plaintiffs suggest multiple alternatives, ranging from outlawing jaywalking and bicycling on all roadways or roadways of 40 mph or higher, to banning pedestrians on narrow medians, requiring them to stay 18 inches from the curb, or requiring pedestrians on medians to wear bright or reflective clothing.

What is required to demonstrate narrow tailoring is somewhat unclear after the Supreme Court's decision in McCullen.  *Compare* Traditionalist Am. Knights of the Ku Klux Klan, 775 F.3d at 978 ("It is far from clear that the Court was intending in the McCullen abortion case to change the law on narrow tailoring. While quoting its longstanding precedent in Ward to define narrow tailoring at no point did the Supreme Court announce a new rule.") *with* Reynolds, 779 F.3d at 231 ("As the Court explained in McCullen, however, the burden of proving narrow tailoring requires the County to prove that it actually tried other methods to address the problem.").  In Verlo the Tenth Circuit noted that the Supreme Court "ha[d] not discouraged courts from considering alternative approaches to achieving the government's goals when determining whether a content-

neutral regulation is narrowly tailored . . . ." Verlo, 820 F.3d at 1135.  The court recognized that in McCullen the "Court itself [had] examined possible alternative approaches to achieving the government's objective to determine whether the government's chosen approach burdens substantially more speech than necessary." Id.  As a result, the Tenth Circuit stated it could not conclude that "the district court applied the wrong legal standard merely because it considered whether the Judicial District had options other than the complete ban on speech . . . that would equally serve its interests." Id.  However, unlike the court in Reynolds, the Tenth Circuit did not hold that the city or county must present evidence showing that it "ever tried to use the available alternatives to address its safety concerns." Reynolds, 779 F.3d at 232.

Here, the court concludes the Ordinance was narrowly tailored with the meaning of the above precedents.  The Ordinance's restrictions apply only to center medians, not to street corners, sidewalks or other surrounding areas.  Further, they apply only to medians in streets where the speed limit is at least 40 mph.  The City thus narrowed the ban to address those situations where the pedestrian is most exposed and at risk --- where pedestrians are exposed to the risk of traffic on multiple sides and where the speed of that traffic is relatively high.  While the government "may not 'forgo[] options that could serve its interest just as well,'" the court is not persuaded that the City "has available to it a variety of approaches that appear capable of serving its interests . . . ." in pedestrian safety. McCullen, 134 S.Ct. at 2539.  Nor will those alternatives decrease in some more effective fashion the distractions to drivers which cause traffic accidents, another public safety goal of the ordinance.

The cases plaintiffs cite to demonstrate that the Ordinance is not narrowly tailored are distinguishable and involve prohibitions more expansive than those involved here. The ordinance in <u>Cutting</u> banned standing, sitting, staying, driving, or parking on <u>all</u> median strips in the city of Portland, Maine, <u>Cutting</u>, 802 F.3d at 79 (ordinance "indiscriminately bans virtually all expressive activity in all of the City's median strips"). The ordinance in <u>Reynolds</u> prohibited soliciting from <u>all</u> medians in Henrico County, Virginia. <u>Reynolds</u>, 779 F.3d at 231 (amended ordinance "applied to all County roads, regardless of location or traffic volume, and includes all medians . . ."). The solicitation ban in <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936 (9th Cir.2011) (*en banc*) "applie[d] citywide to <u>all</u> streets and sidewalks in the City." *Id*. at 949. Similarly, the statute challenged in <u>McCullen</u> "create[ed] 35-foot buffer zones at every [abortion] clinic across the Commonwealth." <u>McCullen</u>, 134 S.Ct. at 2539. In contrast to those situations, Oklahoma City has not banned pedestrians from <u>all</u> medians. *See* <u>Doe</u>, 667 F.3d at 1136 (Like the Supreme Court, we 'generally will not strike down a government action' for failure to leave open adequate alternative channels of communication 'unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting.'") (quoting <u>Citizens for Peace in Space v. City of Colorado Springs</u>, 477 F.3d 1212,1225 (10th Cir. 2007)). It also has not enacted an ordinance that is "wildly underinclusive," as plaintiffs argue. The court is not persuaded that cyclists, pedestrians on the sides of the road, jaywalkers, stationary signs or workers periodically maintaining landscaping present the same type of problem as pedestrians

located on medians in busy streets.  The ordinance also is not "riddled with exceptions." Williams-Yulee v. Florida Bar, 135 S.Ct. 1656, 1669 (2015).

Finally, the ordinance satisfies the remaining requirement that it leaves open ample alternatives for communications.  As one plaintiff acknowledged, plaintiffs are not proscribed from sitting, standing or staying at the same intersections they did before.  They just cannot stand in the medians, in the middle of the road, at some locations.  *See* Doc. #158-11, p. 5.  They can move to the side of the road or to the corners of intersections where they have more exposure.  Admittedly some of medians at the "high visibility, high volume intersections," are now off limits, but that does not necessarily render the restriction improper.  *See* Reynolds, 779 F.3d at 232 n.5 ("The 'available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech.'") (internal quotation marks omitted).  But at least 80 medians in the City, not including those in the Capitol-Medical Center Improvement and Zoning District, are not affected by the ordinance.[21]  *See generally* iMatter, 774 F.3d at 1265 (stating in context of an as-applied challenge "[i]t is true, as the district court noted, that the Plaintiffs' indigence denied them the ability to present their message as effectively as they might have had they had access to State Street itself (rather than adjacent sidewalks), but it did not deny them the ability to disseminate their message.").  The director of the Curbside Chronicle acknowledged that the magazine has found new sales spots for their vendors notwithstanding the Ordinance. And, as noted above, the medians south of the State Capitol, which plaintiffs asserts are

---

[21] *See generally Plaintiffs' Exhibit 42.*

irreplaceable for their rallies and protests, are not governed by the Ordinance absent more than has been shown here.[22]   The plaintiff representative of the Libertarian Party testified that, even under the 2015 ordinance, the Party was able to obtain the signatures needed during its petition drive for ballot access.   The court concludes the Ordinance leaves open ample alternative channels through which plaintiffs may communicate their protected speech.

Having determined that the Ordinance is narrowly tailored to serve a significant governmental interest and leaves open sufficient channels of communications, the court concludes the Ordinance is constitutional as against plaintiffs' First Amendment challenge.

Plaintiffs' remaining claim is that the ordinance deprives them of liberty protected by the Due Process Clause of the Fourteenth Amendment.   They rely on City of Chicago v. Morales, 527 U.S. 41, 53 & 54 n.19 (1999).  A plurality of the Supreme Court stated in that case that "[F]reedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Id*. at 53.  However, defendants argue, and plaintiffs do not seriously dispute, that the right to loiter is not a fundamental liberty interest.  As a result, plaintiffs' challenge triggers rational basis review. *See* Doe v. City of Lafayette, 377 F.3d 757, 772-73 (7th Cir. 2004).  To be constitutional, the ordinance "'need only be rationally related to a legitimate government purpose.'" Powers v. Harris,

---

[22] *Because this case is fundamentally a facial challenge, the court should not rely on the plaintiffs' "individual circumstances in evaluating whether there were adequate alternative channels of communication."* Doe, *667 F.3d at 1135 n.17.   However, the plaintiffs are representative of those "whose access to speech is restricted by this regulation." And to the extent plaintiffs are pursuing an-applied claim, the court's conclusions support the denial such a claim.*

379 F.3d 1208, 1215 (10th Cir. 2004) (quoting <u>Save Palisade FruitLands v. Todd</u>, 279 F.3d 1204, 1210 (10th Cir.2002)).  For the reasons stated previously, the court concludes that public safety is a legitimate governmental interest and that the median ban is rationally related to that end.  Therefore, the court rejects plaintiffs' challenge to the Ordinance based on the Fourteenth Amendment.

Accordingly, the court concludes Ordinance No. 25,777 is constitutional as against the challenges to it advanced here.  Judgment will be entered in favor of defendants and against plaintiffs.

**IT IS SO ORDERED**.

Dated this 19th day of  December, 2018.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE