# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CALVIN McCRAW, | ) | |
| G. WAYNE MARSHALL, | ) | |
| MARK FAULK, | ) | |
| TRISTA WILSON, | ) | |
| NEAL SCHINDLER, | ) | |
| OKLAHOMA LIBERTARIAN PARTY, | ) | |
| RED DIRT REPORT, | ) | # CIV-16-0352-HE |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| CITY OF OKLAHOMA CITY, an Oklahoma | ) | |
| municipal corporation; | ) | |
| WILLIAM CITY, in his official capacity as | ) | |
| CHIEF OF THE OKLAHOMA CITY | ) | |
| POLICE DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF D. MICHAEL MCBRIDE III

I, D. Michael McBride III, of lawful age, pursuant to 28 U.S.C. § 1746,

declare as follows:

### INTRODUCTION & CONTEXT

1.      At the outset, I note the importance of constitutional litigation to our

democracy.  We need lawyers with adequate competence and professional skill

to protect the Constitution.  We also must adequately attract and compensate

lawyers to prosecute these matters.  I hope this declaration assists the court with

its duty under 28 U.S.C. § 1988.  These cases are hard--for the Court, appellate

courts and for counsel on both sides.  The issues are novel, hotly contested and



PLAINTIFF'S EXHIBIT

7

McCraw v. OKC, No. CIV-16-352-HE

involve core issues of adjudicating the boundaries of First Amendment public fora. With this case consuming five years and reaching resolution through denial of certiorari by the Supreme Court of the United States, all involved have expended tremendous resources and time.

2.      While I have neither reviewed Oklahoma City's billing records nor the draft of Plaintiffs' fee application, I am aware that Plaintiffs' counsel expended more than 3,000 hours collectively among five lawyers in addition to the time of many volunteer law students, in this historic matter (hours current as April 23, 2021, and counting):

- Professor Joseph Thai--1,599 hours

- Micheal Salem--528 hours (current through March 1, 2021)

- Megan Lambert--464 hours

- Brady Henderson--278 hours

- Gregory Beben--146 hours

These logged hours began prior to filing. Oklahoma City officials enacted the unconstitutional ban over warning from the City's internal legal department about its potential invalidity as well as liability for the attorneys' fees of successful challengers.[1]  It is an understatement to say that cases like these would never be

---

[1] Plaintiffs' Trial Exhibit 14 (Aug. 18, 2015 email of Ken Jordan) and referenced by the panel in *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1062 (10th Cir. 2020).

brought and resolved without significant commitment and skill.  It is a reasonable expectation that, pursuant to § 1988, the Court will ultimately award reasonable fees for vindicating important public constitutional rights.

3.     In analyzing the declarations, time records, decisions and dockets to prepare this declaration I have volunteered more than 30 hours.  I do so to assist the Court and counsel in rendering a fair and reasonable fee award in resolving these critical issues.  Section 1988 provides the statutory framework that federal rights are adequately enforced by awarding lodestar reasonable fees and, in rare and exceptional instances, an enhancement.  In my opinion, this is one of those rare cases meriting a modest enhancement.

4.     In considering a modest enhancement, the Court must apply objective, consistent and reviewable standards.

## RELEVANT EXPERIENCE FOR FEE OPINION

5.     I have served as a director of Crowe & Dunlevy, P.C. ("Crowe") since joining Crowe as a shareholder in 2007.  I am licensed to practice law in the State of Oklahoma (OBA # 15431).[2]  I have practiced law since 1993.  Crowe maintains offices in Tulsa, Oklahoma City, and Dallas, Texas, with over 120 lawyers and scores of specialized support staff including paralegals and a

---

[2] B.A., Trinity University (Philosophy & Political Science, 1989); J.D., University of Oklahoma College of Law (emphasis in federal Indian and commercial law, 1993).

librarian lawyer.  I practice in the Tulsa office, primarily in federal Indian law, gaming, litigation and general counsel work.

**I.**  **Federal Courts Practice & Expert Witness Experience**

6.      I am also admitted to practice before the following United States District Courts: Western (1999), Eastern (1997), and Northern (1994) Districts of Oklahoma; the District of Columbia (2014), the Court of Federal Claims (1994), the United States Courts of Appeals for the Seventh (2011), Tenth (1997) and District of Columbia (2014), and the Supreme Court of the United States (1997).[3]

7.      I have tried over 50 cases to conclusion in federal, state and tribal courts and arbitrations, including numerous jury trials in federal and state courts, and a successful Fourth and Fourteenth Amendment case in *Big Elk v. Kastning, et. al.* No. 96-CV-87 (N.D. Okla.), 141 F.3d 1184, 1998 U.S. App. LEXIS 6583 (10th Cir. 1998)(unpublished, denying County's qualified immunity appeal and remanding for trial) and *Big Elk v. Bd. of County Comm'n of Osage Co.*, 3 Fed.Appx. 802, 2001 WL 82292 (10th Cir. 2001)(post trial fee challenge).

---

[3] In addition to those federal courts, I am licensed to practice in numerous tribal courts including: Cherokee Nation (1995), Chickasaw Nation (1996), Seminole Nation (1997), the Osage Nation (2008), the Kickapoo Tribe of Oklahoma (2010) as well as the Courts of Indian Offenses serving many jurisdictions in the eastern and western districts of Oklahoma, including the Courts of Indian Appeals operating from Anadarko and Miami Agencies of the Bureau of Indian Affairs (1994).  I have previously practiced in Sac & Fox Nation (2000), the Muscogee (Creek) Nation (1995), the Ho-Chunk Nation of Wisconsin (2010) the Duck Valley Shoshone Paiute Tribes and the State of Nevada courts (1993).

8.     I have also previously served the Northern District of Oklahoma as an adjunct settlement judge and as a member of the Criminal Justice Act panel for a number of years.

9.     Crowe has statewide practices in Oklahoma (and Texas), which include all three federal district courts within Oklahoma, and a national practice in select federal courts around the United States, including the Supreme Court.

10.     My involvement in federal Indian Law frequently requires my appearance in federal courts, and I am experienced in those practice venues.

11.     I have served as a designated expert witness regarding federal Indian law and gaming in two federal courts and two state courts in Oklahoma, Arkansas and Texas.[4]

**II.     Tribal Jurist Experience**

12.     Additionally, I have served as a part-time justice and special district judge for the Kaw Nation and the Pawnee Nation for 17 years while also engaging in the full time practice of law.  From these experiences, I have

---

[4] *L & R Resources, LC v. James J. Monaghan, individually and d/b/a Dynamic Gaming Solutions, Inc.; Katdady, Inc.; Lee Sutherlin; and C.J. Perme*, Case No. 4-00-CV00836 JMM (E.D. Ark.); *Raymond Friedlob as Receiver for Alpine Mutual Fund Trust v. the Kiowa Tribe of Oklahoma and Gary Pitchlynn, Esq.* Case No. CJ-96-32 (Caddo Co., OK); and *Raymond Friedlob as Receiver for Alpine Mutual Fund Trust v. the Comanche Tribe of Oklahoma, Comanche Enterprises and Milton Sovo, Campen USA, Inc., a Wyoming Corporation, and Nathan Young, Esq., John E. Ledge and Charles E. Campen,* Case No. CJ-96-82 (Grady Co. OK); and *United States v. Garza, et. al.*, No. DR-04-CR-986-AML (W.D. Tex.).

evaluated many times the admission, qualification, disqualification and conduct of lawyers, as well as the reasonableness of litigation efforts on a wide variety of constitutional, internal governance, election, criminal and civil issues.  My dockets included complex constitutional issues, conflicts between state, federal and tribal laws, and many issues of first impression.

### III.   Private Practice & Lawyer Management Experience

13.     I chair Crowe's Indian Law & Gaming practice and have done so since joining the firm as a shareholder in 2007.[5]  I manage a number of lawyer teams on various litigation matters in federal, state and tribal courts and administrative bodies.  As a part of my duties as chair, I manage practice area lawyers, as well as review and recommend adjustments of Crowe lawyers' hourly rates on an annual basis across many industry service groups.  I also review and edit billing time entries of directors and associates prior to the issuance of monthly invoices to a wide swath of clients, including major corporations, small companies, not-for-profit and educational organizations, and I work with insurance companies for compliance with billing guidelines on relevant matters.

14.     I make these reviews to ensure uniform billing practices, ensure the exercise of good billing judgment and equity, and to provide a fair appraisal of the

---

[5] I chaired the Indian Law & Gaming Practice Group at another firm for nearly a decade before joining Crowe. I also practiced for several years as McBride Law Offices and have previously worked in Indian legal services.

fees, costs and expenses charged to our clients.  This duty includes exercising billing judgment to ensure value, excellent service and alacrity to our clients.

15.    I have experience in working on complicated national mass tort litigation, currently including over 100 pending cases in a Multi-District Litigation matter in the Northern District of Ohio and a bellwether tribal case in the Eastern District of Oklahoma, remanded for trial.  I have experience in helping to manage extensive discovery, scheduling, briefing, strategy, expert witnesses, mediation and related pre-trial work as well as collateral appeals.

16.    I serve in the management of Crowe as a member of the associate compensation committee and have done so for approximately nine consecutive years.  This committee gathers evaluations from shareholders and makes qualitative and quantitative recommendations regarding associate salaries and bonuses on an annual basis to Crowe's executive committee and to our shareholders.

17.    I represent or have previously represented over 25 tribal governments or their entities as attorney general, general counsel, and special litigation counsel.  I advise, or have advised, many companies on federal Indian law, policy, litigation and transactional issues.  I have participated as amicus curiae and counsel of record before the Supreme Court of the United States in several Indian law cases and regularly participate in tribal sovereignty amici

working groups on pending cases before federal circuits and the Supreme Court.[6]  In the course of this representation of tribal governments, their businesses and commissions, I am frequently delegated responsibility to hire and supervise outside and special counsel on various matters.  In this capacity, I manage the clients' legal work, collaborate in strategy and policy issues, review and recommend approval of invoices (or resolve issues), and serve in a quality control function.

18.    In retaining other law firms and outside lawyers, I have negotiated legal services with hourly, contingency, and blended-hourly / contingency performance-based and hybrid engagement agreements.  I am well-versed in value based arrangements that benefit both the client and the engaged law firms, motivate outstanding results, and strike a good balance between value and risk for clients and the engaged counsel.

19.    For further detail of my experience and qualifications, I attach curriculum vitae to this Declaration as <u>Attachment A</u>.

---

[6] Br. for the Seminole Nation of Okla. & the Muscogee (Creek) Nation as Amici Curiae, *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc*., 523 U.S. 751 (1998), *reported at* 1997 WL 528601; Br. for the Thlopthlocco Tribal Town & the Sac and Fox Nation as Amici Curiae, *Nevada v. Hicks*, 533 U.S. 353 (2001), *reported at* 2001 WL 57508; Br. for the Muscogee (Creek) Nation & the Seminole Nation of Okla. as Amici Curiae*, Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017), *aff'd. sub nom. Sharp v. Murphy*, 140 S. Ct. 2412 (2020) (companion case to *McGirt v. Okla.*, 140 S. Ct. 2452 (2020)), *reported at* 2016 WL 11295447 (counsel of record: Kanji & Katzen).

### IV.    Teaching, Scholarship and Judicial Clerkship Experience

20.     I have also served as a guest lecturer at the Tulsa, Colorado,

Wisconsin and Kansas law schools and at the National Judicial College in Reno,

Nevada.  I also served as an adjunct professor of law at the University of Tulsa

College of Law.  I write and speak frequently about federal Indian and gaming

law and have presented at the annual Sovereignty Symposium every year since

approximately 1995.[7]  I frequently lecture nationally and internationally each year.

Various television, documentary, print and radio outlets frequently consult with

and interview me regarding federal Indian law and gaming including international

broadcasts.  I have published approximately 60 articles in various publications

including law reviews and bar journals, magazines, newspapers, trade

publications and, increasingly, online media regarding federal Indian law and

gaming.  I have given more than 100 in person and Zoom-style speeches and

presentations to international, national, regional, trade and industry and local bar

associations and organizations, judicial groups, and community organizations on

various topics.  Interestingly, RTVI, a Russian television network with over 10

million viewers, featured me as a commentator twice in 2020 on news programs

covering the Supreme Court of the United States cases involving federal Indian

law.  I interned for an Oklahoma Supreme Court justice, clerked for the chief

---

[7] The Oklahoma Supreme Court awarded me the inaugural Justice Rudolph
Hargrave Prize for outstanding scholarly article by a faculty member in 2013.

magistrate judge for the Court of Indian Appeals, and served as a teaching assistant at the University of Oklahoma College of Law.  These experiences help inform my judgment in assessing academic expertise, particularly with Professor Thai--a critical attribute in the ultimate success of this complex constitutional litigation.

21.    I served in various elected officer roles for the International Masters of Gaming Law, a peer reviewed organization of limited membership.  In that capacity I have also had occasion to engage counsel, direct legal services, review, approve and recommend payment of invoices for the organization.

22.    I served the Federal Bar Association in various local, regional and national roles including serving as president of the Northern and Eastern Oklahoma Chapter, vice president for the Tenth Circuit three times, a national board member, chair of the Indian law section, and as general counsel to the organization.  In the latter capacity, I served the national president and board of directors by directing all legal matters including retaining and directing outside legal counsel, participating in setting strategy, reviewing work product and approving fee invoices.

## V.    <u>Selected Peer Review & Awards</u>

23.    Chambers USA, a legal industry peer-review organization has designated me as a "Star Individual," its highest rating and as well as listing me

at "Band 1," their highest professional rankings in "Native American Law." Similarly, Best Lawyers in America has given me its highest ratings for "Gaming Law" and "Native American Law" for a number of years as well as "Lawyer of the Year."  Also, Super Lawyers rated me with its highest ratings for many years in several categories.  The American Inns of Court in Tulsa have honored me with the John S. Athens Award for ethics.  I have received several additional awards from the Federal Bar Association, the Oklahoma Bar Association, the International Masters of Gaming Law and the Tulsa County Bar Association, and the University of Oklahoma College of Law and the American Indian Law Review.

## VI.    <u>My Hourly Rates</u>

24.    My hourly rate for Indian law and gaming in some specialized matters is $650 an hour; my current 2021 standard hourly rate is $525.

## VII.    <u>Fee Recovery Civil Rights and Constitutional Litigation</u>

25.    In my practice areas, I occasionally become involved in the recovery of court-awarded attorneys' fees on behalf of clients in federal, state and tribal courts.

26.    I have represented clients with civil rights claims—in particular, obtaining a successful jury trial verdict for plaintiffs involving Fourth Amendment and due process claims.  I served as co-counsel with Micheal Salem in that case before the recently-departed Hon. Thomas R. Brett of the Northern District of

Oklahoma, and before the Tenth Circuit on qualified immunity issues in the *Big Elk* litigation.[8]  The litigation resulted in a significant fee award after nearly four years of litigation before state court, the District Court and the Tenth Circuit.

27.     I also have experience with litigation involving constitutional claims. In my opinion, civil rights litigation, especially in the area of the First Amendment, is complex and difficult, particularly in cases such as this, with many competing interests of public safety, local governance, maintaining order, accommodating free speech, and protecting public fora. Weighing city ordinances regarding protected and regulated speech is very difficult, as is applying the constitutional tests required to adjudicate the complex law and frequently fact-intensive disputes.  This case required particular legal skill and effort regarding the tremendous data and required experts to resolve the case.

28.     Although I draw upon my experience in the practice of law and as a jurist, I opine in my individual capacity only.  My views are not reflective of the position or policy of my firm, or any of the above governments or organizations I have listed herein.

### ANALYSIS & OPINION REGARDING PLAINTIFFS' FEE REQUEST

---

[8] *See supra* note7.  I also note that a young lawyer in the mid-1990s I was attracted to seek the expertise and co-counsel relationship in *Big Elk* with Micheal Salem in part because of his passionate commitment to protecting constitutional rights, his scholarship and sponsorship of annual civil rights awards at the University of Oklahoma, College of Law.

I.     **My Review of Fee Declarations & Time Records**

29.     In preparation for this Declaration, I have reviewed the following documents and records:

- Declaration of Joseph Thai and accompanying time records;

- Declaration of Micheal Salem and accompanying time records;

- Declaration of Brady Henderson and accompanying time records;

- Declaration of Gregory Beben and accompanying time records;

- Declaration of Megan Lambert and accompanying time records.

30.     I have also had access to the District Court docket for this litigation, as well as the filings in the District Court, the Tenth Circuit, and the Supreme Court for reference in my examination of these documents.  I carefully reviewed the District Court and Tenth Circuit decisions, as well as some briefing before the Tenth Circuit.

31.     In reviewing these documents, I focused on the educational background, relevant experience, and expertise of the Declarants in setting an hourly rate for each.  I also relied upon my legal practice experience in the litigation of attorney fee matters, as well as my management and employment experience with Crowe and the clients and organizations referenced above.

32.     In preparing fee applications for clients in federal and tribal courts, I have become familiar with and have applied relevant Tenth Circuit benchmark

attorney fee lodestar authorities such as *Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983); *Case v. Unified School Dist. No. 233*, 157 F.3d 1243 (1998) and their progeny, *Purdue v. Kenny A*., 559 U.S. 542 (2010), and earlier cases such as *Hensley v. Eckhart*, 461 U.S. 424 (1983) and its progeny.  I am also familiar with benchmark fee-awarding factors used by Oklahoma courts, such as those listed *State ex rel. Burk v. City of Okla. City,* 1979 OK 115, 598 P.2d 659, *Oliver's Sport Center, Inc. v. Nat'l Standard Ins. Co.*, 1980 OK 120, 614 P.2d 291, and, most recently, in *Strack v. Continental Resources*, 2021 OK 21, ___ P.3d___ (April 20, 2021).

33.     Four and then eventually five billing attorneys represented the Plaintiffs here.  That is not unusual in my experience--these are very difficult and time-consuming cases.  I have experience in comparably complex and significant civil litigation for Crowe where we have used three primary counsel and as many as eight other timekeepers in litigation, including six attorneys, a paralegal, and legal assistant.  One current federal case has over 12 lawyers between two law firms involved in pre-trial litigation.  Some of these other timekeeper attorneys provided assistance in limited areas such as appeal, legal research, offensive and defensive discovery, experts, conflict issues and settlement.

## II.     **Market Hourly Rates Knowledge**

34.    I am familiar with the hourly rates of experienced civil trial attorneys in the Oklahoma City and Tulsa areas, including attorneys within and outside my firm.  I also have familiarity with regional and national firm billing rates.

35.    Based upon that experience and the attorney resumes that I have reviewed, I suggest the following hourly rates for each of the attorneys:

A.    **Joseph Thai.**  Based upon Professor Thai's Declaration and my experience, I think the appropriate range of hourly rates for someone of Professor Thai's experience and specialized knowledge would be $500 to $675 an hour.  I base this range upon Professor Thai's top academic background; significant law clerk experience at both the United States Court of Appeals for the Tenth Circuit and the Supreme Court of the United States; decades of teaching, writing, and commenting on Constitutional Law, the First Amendment, and the Supreme Court as a law professor at the University of Oklahoma; and involvement in significant and successful Constitutional Law litigation at all levels of the federal judiciary.  I have personal familiarity with Professor Thai's reputation as a national expert on Constitutional Law, the First Amendment, and the Supreme Court, and as one of the very top legal experts in those areas in Oklahoma.  He frequently provides comments on constitutional and Supreme Court issues to the media.  His requested hourly rate of $500 an hour falls on the low

end of a reasonable hourly rate spectrum for someone of Professor Thai's exceptional experience, expertise, and demonstrated skill level locally, and *far* below the reasonable spectrum for someone of his experience and skill at a regional and national level.  The market for skilled and experienced constitutional litigators within the Oklahoma market is rare and hard to quantify with a market hourly rate.  This is one factor that supports an enhancement, together with several other factors identified below.

      B.   **Micheal Salem**.  Based upon Mr. Salem's Declaration and my experience, I think that the appropriate range of hourly rates for someone of Mr. Salem's experience would be $450 to $650 an hour.  Over the past quarter century, I have become aware of Mr. Salem's general reputation within the Oklahoma legal community, his participation for decades on the Oklahoma Bar Association's Client Security Fund Committee and the Legal Ethics Advisory Panel, and his exceptional experience in litigation involving unpopular and difficult civil rights cases, especially within the area of the First Amendment, Fourth Amendment and "prisoner's rights" issues (including issues of "medical treatment," "access to courts," and "right to counsel").  He is passionate about protecting the constitutional rights of those without means to bring suit.  Mr. Salem has successfully litigated a number of these very difficult and unpopular cases.  As a result,

his general reputation is that of a highly experienced and skilled First Amendment, Fourth Amendment, and civil rights attorney.  I believe Mr. Salem's requested hourly rate of $400 falls *below* the range of an appropriate hourly rate for someone of his experience, knowledge and skill.  I think he is too humble in his request.  Frankly, I think Mr. Salem's fee rate should be much higher, given his many decades of experience and history of success in civil rights litigation.  This is another factor which I believe supports a modest enhancement of the lodestar fee award.

C.   **Brady Henderson**.  Based upon Mr. Henderson's Declaration and my experience, I think that the appropriate range of hourly rates for someone of Mr. Henderson's experience would be $300 to $385 an hour, especially in light of his extensive and relevant experience litigating civil rights cases, including constitutional law cases, as ACLU-OK's Litigation Director.  I find his requested hourly rate of $300 an hour as on the low end of an appropriate hourly rate spectrum for this work.

D.   **Gregory Beben.**  Based upon Mr. Beben's Declaration and my experience, I think that the appropriate range of hourly rates for someone of Mr. Beben's experience would be $250 to $295 an hour.  A significant factor supporting that rate is his relevant subject matter expertise with homelessness and panhandling through his years of legal

work at Legal Aid Oklahoma, which informed and contributed to the success of the legal team's First Amendment claims.  I note that Mr. Beben was the initial lawyer who represented Mr. McCraw and had the primary client relationship initially and throughout the litigation.  This is very important.  I classify the requested hourly rate of $250 an hour as on the low end of appropriate hourly rates.

     E.    **Megan Lambert.**  Ms. Lambert began this case as a new admittee to the Bar.  Based upon Ms. Lambert's Declaration and my experience, I believe that the appropriate range of hourly rates for someone of Ms. Lambert's experience would be $200 to $235 an hour.  I noted also that the litigation lasted a number of years. At Crowe, we regularly increase hourly rates for new associates as they gain experience and efficiency with their legal skills.  Given her documented progressive experiences she could command the high end of this range or more in private practice today.  I would classify the requested hourly rate of $200 as on the low end of appropriate hourly rates.

     F.    I have never met Mr. Henderson, Mr. Beben, or Ms. Lambert.  But in my experience, each of these assigned hourly rates are within the range of rates charged by attorneys at other firms having similar

experience and skill within the Oklahoma City and Tulsa areas in this otherwise complex and specialized area.

     G.    I understand that although this litigation has extended over five years, pursuant to relevant legal authorities I assign an hourly rate based upon prevailing hourly rates at the time of the making of this Declaration to compensate for the delay of payment after five years of litigation.  I have taken this into account in the making of this declaration.

36.    One general comment about hourly rates and experience:  the lower hourly rates of Mr. Henderson, Mr. Beben and Ms. Lambert take into account inefficiencies of younger lawyers learning and gaining experience.  The lower rates help absorb the "learning curve."

37.    The lower hourly rates Mr. Henderson, Mr. Beben and Ms. Lambert, and the significant time written off among them, *discussed infra*, also provide significant support for a modest enhancement of the Court's lodestar fee award.

38.    **Risk and Payment Delay.**  In addition, even as I opined on reasonable hourly rates above, I highlight that few lawyers would take on the risk of (i) not getting paid at all, (ii) not getting paid for many years until the very end of the litigation, and (iii) the potential "contingency" reward of only receiving market hourly rates.  Again, these legal issues are hard and complex, and this

case took a number of years--longer than anticipated, and through no fault of Plaintiffs' counsel.

39.    **Notorious and Unpopular Causes and Clients.**  This type of litigation attracts very few.  First, at its core, this complex litigation requires adjudication of substantial constitutional questions and the development of an extensive factual and empirical record.  Second, most attorneys would choose not to pursue this litigation when the object of the lawsuit involves unremunerative and unpopular subjects, *i.e.*, declaratory and injunctive relief against the City of Oklahoma City on behalf of impoverished panhandlers and grassroots activists advocating politically unpopular views in the public square. The challenge in obtaining competent counsel to see such a difficult case through to conclusion is another factor that supports a modest enhancement of the lodestar fee amount.

40.    Plaintiffs' counsel faced a very difficult legal case that required creativity in light of the high risk and intense media backlash involved in representing unpopular causes.  The media scrutiny often focuses on the bill taxpayers will pay for the City outlawing protected First Amendment speech.[9]

---

[9] *See*, *e.g.,* William Crum, "Oklahoma City loses bid to have U.S. Supreme Court revive panhandling ordinance, taxpayers' bill could exceed $1 million, OKLAHOMAN (March 29, 2021), available at https://www.oklahoman.com/story/news/2021/03/29/oklahoma-city-panhandling-

But protecting the public fisc from the fees necessary to vindicate constitutional rights runs counter to the congressional policies underlying § 1988.  See *Ramos v. Lamm*, 713 F.2d 546, 552 (10th Cir. 1983):

> The defendants' second contention is that attorney's fees should be decreased when the fees will come from public funds and hence ultimately from the taxpayers.  This contention has already been rejected by this Court . . . .  Violations of this statute require action under color of state law; thus, a governmental entity will often be responsible for the payment of the fee.  Reducing the potential award for a large group of defendants would counteract the congressional intent to induce civil rights enforcement.

41.    **The Personal and Business Toll of Constitutional Fee Shifting Cases.**  There is a real toll on lawyers who undertake these challenging matters for multiple years with no guarantee of remuneration and not taking on other paying work.  My experience while working as McBride Law Offices for many months while litigating the *Big Elk* case in the Northern District Oklahoma with no revenue from other clients informs my view of this matter.  My costs for office rent, utilities, support staff, law school loans, professional liability insurance, estimated quarterly taxes, car payments and repairs, car and renters insurance, home rent, medical, spouse and child, food and shelter and other living expenses did not stop.  Those were lean times indeed.  It took more than four years before the County paid court-ordered § 1988 fees in that case.  I had to subsidize that

ordinance-rejected-hearing-us-supreme-court/7045732002/  (last viewed April 24, 2021).

litigation with revenue from other client work and my savings. I also forewent other lucrative and immediate paying client work to take on and see the case to the end. Also, as principal in a solo practice or a shareholder at a larger firm, I am the last to be paid. In shouldering the financial risk, support staff, salaried employees, the government and creditors are paid first. This also provides stability to retain talented lawyers, paralegals and support staff that commit their career in working with me (and at Crowe).

42.    I know that Plaintiffs' counsel here also experienced these sorts of trade-offs in many similar ways. For example, as a solo practitioner, Mr. Salem's 500 hours of work on this case necessarily limited his capacity to take on paid work to cover his practice's overhead. He also paid out-of-pocket for his litigation expenses, including travel to and from Denver for oral argument.

43.    Professor Thai attests that he sacrificed nights, weekends, and family time over five years to work on this case—approximately 1,600 hours—on top of his full-time job as a law professor. Because this case demanded much of his "spare time," he had to turn down opportunities for paid work (or spending time with family). He also paid out-of-pocket for his travel expenses related to oral argument.

44.    I understand that most of Plaintiffs' litigation costs were paid by ACLU-OK. The expense and lawyer time that this non-profit civil rights

organization devoted to this case limited its capacity to take on other impact litigation and advocacy work.  The organization also had staff, lawyers, overhead and other bills to pay for the past five years.

45.     Also, in my experience, modern law firm overhead costs can consume approximately 40% to 50% of fee revenue, particularly a full service law firm that employs a cadre of skilled professionals with niches of expertise.[10] Typical of-counsel arrangements provide for 50% of revenue to take those costs into account.  Toting overhead for five or more years on a major civil rights case can exact a heavy financial toll.

46.     I also understand that the attorneys I have listed above also performed services in this case not only in the district court, but also at the Tenth Circuit and the Supreme Court.

47.     **Market Rates.**  I believe hourly rates for representation at the Tenth Circuit and the Supreme Court levels should be determined separately from hourly rates for the Oklahoma City and Tulsa markets.  Hourly rates for the Tenth Circuit and the Supreme Court are not necessarily local or even regional, but could encompass hourly rates based upon national and major metropolitan area comparisons.  Again, I believe Professor Thai and Mr. Salem hourly rates are low

---

[10] *See, Purdue*, 559 U.S. at 570 (Breyer J., dissenting) ("[r]outine overhead expenses . . . typically consume 40% of their fees, see Altman Weil Publications, Inc., Survey of Law Firm Economics 30 (2007 ed.))."

for the Oklahoma market and well below reasonable market rates for similar lawyers at the Circuit and Supreme Court levels.

48.     On April 20, the Oklahoma Supreme Court opined on the reasonableness of attorneys fees in a class action involving the underpayment of oil and gas royalties.  *Strack*, 2021 OK 21.  While the Court grappled with the methodology for calculating reasonable fees from a "common fund" it analyzed lodestar and contingency fee percentage methods to reach its holdings.  The Court noted community standards for class counsel performing "highly specialized legal services" of rates ranging from $550 to $900 an hour for "attorneys from national litigation firms that performed services in oil and gas class actions in Oklahoma."  *Strack* at ¶ 23 and n. 10.  The *Strack* Court found the district court did not abuse its discretion with average lawyer rates of $790 an hour for the litigation that began in 2010 and spanned seven years.  *Id.*

49.     **Fee Enhancement.**  I understand that Professor Thai, Mr. Salem, Mr. Henderson, Mr. Beben, and Ms. Lambert will seek a modest <u>ten percent upward adjustment</u>.  Given the significant success, the novel issues, and the importance of the ruling to all citizens within the Tenth Circuit, this is one of those unusual cases that warrants such an upward adjustment to the fee lodestar.  *See Perdue*, 559 U.S. at 552-57 (discussing factors).

50.     I believe that the unpopularity of a case permits enhancement of the hourly rate so as to attract (and retain) competent counsel.  This case took a half-decade to resolve.  However, I understand that the attorneys here seek fee rates less than the usual and customary rate for lawyers of equivalent experience and skill in the local market involved in complex federal litigation.  These rates are less than hourly rates otherwise necessary to attract other counsel to a First Amendment and civil rights cases of this sort.  I also believe the complexity of this litigation requires counsel even more specialized and rare than oil and gas class action lawyers.

51.     Given the risk, the long delay in getting paid, the abundance of other immediate paying work, the likelihood of significant out of pocket expenses and the "contingency" of a court awarding a "reasonable" lodestar fee at the end, I personally would not likely undertake such a long and difficult representation of a meritorious civil rights case.  It just does not make good business sense.  A § 1988 statutory assurance of "reasonable fees" a half-decade later is not enough.  To attract worthy and skilled counsel to undertake these cases, an objective enhancement should be considered.

52.     This case is also unattractive because the Plaintiffs sought declaratory and injunctive relief only and no damages, a portion of which might compensate the attorneys at the end.  Unlike in *Strack*, there is no common

damages fund to compensate counsel.  Even if a portion of any possible damages were included in the recovery in this case, in my opinion, the amount that would be available would not add to the attractiveness of this case.  Serving as a "private attorney general" to vindicate constitutional rights is an arduous, challenging and lengthy business and it is not for faint of heart.  That is what § 1988 is meant to encourage.

53.     Most lawyers steer clear of these civil rights cases as they are awarded fees based upon a "contingent hourly rate," with no potential additional upside.  Lawyers don't get paid until the absolute conclusion of the case.  The fee award is then made *only* if the lawyers win the litigation.  The Court issues the total fee award *only* for those hours reasonably related to successful claims.  The risk continues as the fee awards frequently get litigated after judgment by other lawyers who are getting paid the whole time as they go along.  Many significant disincentives militate against skilled lawyers taking on important constitutional litigation.

54.     In contrast, a lawyer billing a client at his normal hourly rate in complex civil litigation is paid on a monthly basis regardless of the success of the underlying litigation and is not usually subject to such "hindsight" scrutiny and uncertainty.  This is certainly true for defense counsel.  Their bills get paid

monthly as they go.  Defense counsel salaries and billing records for comparison purposes could be very instructive to the Court indeed.

55.     While not binding on this Court, the *Strack* Court also conducted an illustrative enhancement analysis of lodestar under Oklahoma statute and case law, including by applying *Burk* factors and its progeny.  *Strack*, ¶ ¶ 25-30.  The Court's analysis supports enhancing Plaintiffs' counsel here.  The Court noted that it has been "modest" when approving enhancements of loadstar calculation awards.  *Id.* at ¶ 26.  The Court noted that while "we rarely approve a multiplier above 1.5" it had approved enhancement multipliers in *Burk* of 1.4, (1979 OK 115, ¶ 17, 598 P.2d at 662) and *Spencer v. OK Gas & Elec. Co.*, (2007 OK 76, 171 P.3d 890).  *Id.* at ¶ 26.  A 10% enhancement in this case falls below the conservative and modest lodestar enhancements approved by Oklahoma appellate courts.

56.     Given the outstanding high level of skill and effort exhibited by Plaintiffs' counsel and their success and performance in this case, exceptional circumstances exist to add a modest enhancement to the lodestar fee award. The Tenth Circuit's conclusion that "[t]he City utterly failed to demonstrate the requisite 'close fit between ends and means' to ensure speech is not sacrificed

for efficiency'"[11] underscores the superior performance of Plaintiffs' counsel in this litigation, especially in obtaining an unanimous reversal on appeal.

57.    **Outstanding legal work by all lawyers.**  Plaintiffs' counsel's superior results and performance were not because of a deficient or inept defense.  Quite the contrary: the lawyers in Oklahoma City's legal department and Phillips Murrah counsel are highly respected, capable and formidable.[12] They made no significant defense concessions and in fact obtained many favorable rulings from this Court.  This is not a run of the mill case.  These factors support an enhancement.

### III.    Hours Expended In The Litigation

58.    I have examined all five lawyers' time records to determine if each lawyer reasonably incurred them.  I conducted the analysis based upon my own experience in billing as (i) a Crowe shareholder and practice manager, (ii) reviewing and editing of directors and associates' pre-billings who work with me, (iii) my knowledge of the billing practices of other attorneys in the Tulsa and Oklahoma City areas; and (iv) regional and national counsel billing practices for complex federal litigation.

---

[11] *McCraw v. Oklahoma City*, 973 F. 3d 1057, 1077 (10th Cir. 2020) (cleaned up).

[12] In particular, I note Catherine L. Campbell for the defendants.  I respect her acumen and skill.  I have followed her accomplishments since law school. Further, it is noted again that municipal counsel warned officials about the potential unconstitutionality of the ban from the beginning.  *See* ¶ 2, n. 1 above.

59.     I am also aware of surveys for the Tulsa legal community breaking down billing rates by firm size, experience and practices.

60.     I also accessed the court docket and individual filings submitted in the District Court, the Tenth Circuit, and in the Supreme Court.  While I have not reviewed them in any comprehensive, start-to-finish way, I used them as a reference if I had questions regarding the amount of time expended by the attorneys related to the preparation of particular filings.

61.     I also did not access any confidential communications, memoranda, research, records, or other protected work product among the attorneys or with their clients, but have relied only upon the public filings I have identified.

62.     **Vindication of Complex Constitutional Rights.**  As I have previously noted, this case involves a challenge to an Oklahoma City Ordinance intended to criminalize the exercise of First Amendment rights on hundreds of City medians.  This is significant litigation in an emerging area of the law. Review of the Tenth Circuit opinion confirms the legal complexity and constitutional importance of the case, the close alignment of the briefing and oral argument with the panel decision on the facts and First Amendment law, and the vindication of the development of a favorable factual record over a three-year period, from discovery through trial.  Developing the empirical data in this case was very important and time-intensive.

63.     In reviewing the docket at the pre-trial stage, there were two separate rounds of motions to dismiss and motions for summary judgment necessitated by the City's amendment of its challenged ordinance, as well as two rounds of extensive discovery, including the deposition of the City's three claimed experts, its Chief Traffic Engineer, and six of the Plaintiffs.

64.     Extensive trial preparation ensued as well as a review of documents and depositions which the plaintiffs' legal team excerpted and submitted as a part of that trial.  The Final Pretrial Report (Dkt# 130) runs 37 pages and lists numerous witnesses and exhibits, further demonstrating the significant attorney time for preparation.

65.     The Report also indicated a total of six days of trial time between the two parties. (Dkt # 130, p. 36).

66.     Thereafter, both sides worked on and filed additional submissions including stipulations and deposition designations of witnesses to shorten the number of in person witnesses they planned to present at trial.  These agreed submissions no doubt significantly shortened the time of trial from six days to only *two* days.  Nonetheless, reducing a six-day trial to two days does not mean a pro rata reduction in time the lawyers must prepare for the trial.  Here, it meant just the opposite.  Counsel had to prepare for a more compressed trial.  Witness examination preparation and presentation of evidence became even more

critical.  The preparation of stipulations of facts and exhibits and creation of extensive deposition designations for multiple witnesses took even more time outside of the courtroom.  The resulting judicial economy required tremendous front end work from Plaintiffs' counsel.

67.     After prevailing at the Tenth Circuit, the Plaintiffs strategically chose to forego preparing and filing a response to the City's petition for certiorari before the Supreme Court of the United States.  In my experience the costs, fees and expenses associated with such a filing could range between $40,000 to $75,000 or more.  This resulted in significant conservation of resources and an ultimate reduction in the total fee application.

68.     I carefully reviewed the lawyers' time exhibits.  I believe that each of the lawyers excised good billing judgment in the hours they actually billed and that the hours listed appear reasonable during the entire five years of this extraordinary lawsuit.

69.     These time records reflect that each lawyer made numerous and notable downward departures in the hours put down on billings verses those hours they actually worked.  Some of the billing lawyers demonstrate those actual adjustments from "raw time" versus "billed time."  Some examples include the following:

70.   **Gregory Beben** discounted approximately 97 hours of documented time, out of 146 hours--some one third of the time he spent on the case.  His discounted time included meetings and calls with the clients, attending court hearings, preparing witnesses for testifying at trial, attending depositions, attending status conferences with all counsel and reviewing opposing parties' filings.  Each of these "no charge" tasks are work responsibilities that members of my legal teams ordinarily charge to clients.  According to Mr. Beben's fee declaration, he did not document many hours (unquantified) relating to email correspondence and telephone conferences over the course of five years.  I spend significant portions of my work days engaged in lengthy telephone and Zoom type conferences and in email communications.  I certainly bill clients for appropriate attention to advancing the clients' legal interests when I do so.  I make one criticism in that his time entries lack detail and that he occasionally engaged in block billing.  Nonetheless, this is certainly not unusual for a public interest lawyer that does not engage in on-going client billing documentation.

71.   **Brady Henderson** kept reasonable time entries appropriate with tasks he performed.  Except for one entry without billable time, he noted in his fee declaration that he omitted time spent (without offering quantification) on many aspects of the litigation because of his management responsibilities for his legal services office.  He noted some specific tasks not billed, including

responding to many press inquiries and the management of his attorneys and support staff. In my daily experience, these tasks are very time-consuming.

72.    **Megan Lambert** also kept contemporaneous time records. She documented 112 hours of unbilled time in addition to her billed time of 462 hours. This amounts to a discount of 24% of her total time. Examples of excluded time include working on the declaration for attorneys fees, coordination and strategy calls with Professor Thai, Mr. Salem, Mr. Henderson and other members of the team, attending trial, preparation of witnesses for trial, weekly coordination calls among the team, preparation of witnesses for deposition, and some research issues. Excepting some minor discount for multiple lawyers on a matter, I would bill clients for these items because they advance clients' legal objectives. Ms. Lambert exercised very conservative billing judgment.

73.    **Micheal Salem** exercised significant reductions in many of his billings. Out of 528 hours actually billed, Mr. Salem's invoices reflect reductions on *almost every* entry. I did not calculate the percentage reductions over 90 or so pages of invoices but it is readily apparent this is quite remarkable. Mr. Salem's time entries reflect assiduous detailing of the tasks performed, why it was important, and all who were involved. These are characteristics I look for in reviewing billing entries from my team members and outside counsel. To a fault, Mr. Salem is probably too generous in his deductions. Thus, his billings are rock

solid and reliable from my review of the litigation.  If a properly performing Crowe associate or director discounted that much reasonable time, I would likely encourage them to not short-change themselves and the firm so much.  We practice law as a business.  And § 1988 is meant to recognize and compensate those that undertake these difficult matters.

74.    **Joseph Thai** also kept reasonable, contemporaneous time records. He documented time devoted to individual tasks and often helpfully provided further detail on what those tasks entailed to substantiate the time recorded (e.g., issues discussed on a conference call or addressed during a brief drafting session).  He also attests to frequently discounting the time he recorded by at least 10 to 20 percent.  As with Mr. Salem, if Professor Thai were billing for my firm, I likely would have advised against this conservative billing practice as short-changing the value of his time.  Clients paying for Professor Thai's services, given his experience and expertise, would and should pay for the full time that he devotes to their matters particularly given the rarity and specialization of his constitutional law expertise.

75.    I noted many other examples of where the Plaintiffs' counsel demonstrate notable billing judgment.  For example, Professor Thai attests in his declaration to numerous instances where he significantly reduced his actually billed time, resulting in hundreds of hours of non-billed time.  Mr. Salem and Ms.

Lambert often did not bill for regular conference calls conducted to coordinate work among the attorneys and determine overall and specific strategy.

76.    In my experience of local billing practices, such conference calls are a regular and essential part of litigation, especially in complex cases.  They are critical for efficiency, team work, and ultimate victory.  I regularly convene and participate in conference meetings or calls when we engage with other firms to set strategy, keep abreast of development and assigned tasks, and delegate work to achieve litigation goals.  No firm I am aware of chooses to write off time for this essential collaboration time for each lawyer involved.  This critical collaboration decreases overall billing by insuring efficiency, immediate communication, and feedback regarding tasks, setbacks, obstacles and overcoming them.  I find this collaboration very effective.

77.    Lawyers normally bill clients for travel (including hourly rate for travel).  They also fairly bill back the expenses for depositions, photocopying, parking, expert witness fees, electronic legal research, courier service and other out of pocket expenses as a normal and incidental expenses to litigation.  This is consistent with my experience with the billing practices of my firm and other firms in the Oklahoma City and Tulsa areas.

78.    Crowe employs paralegals and others, at times including law student clerks or interns, to assist in the preparation of litigation.  It is a customary billing

practice within Crowe and within the Oklahoma City and Tulsa areas to itemize and bill for the time of trained and certified legal assistant / paralegals and other paraprofessionals.  My experience is that these professionals can complete intensive, delegated tasks at a much lower rate than lawyers charge.  Today, we bill out paralegals at our firm depending on experience, specialized computer and technical skills at an hourly rate of $155 to $275, with paralegals I utilize most frequently in our practice group charging between $200 to $275.

## IV.    CONCLUSION

79.    For these reasons above, I believe that the Plaintiffs' fee application with the enhancement they will request are reasonable and modest.

I DECLARE NOTHING FURTHER.


## **VERIFICATION**

I state under penalty of perjury that the foregoing claim is true and correct according to my own knowledge and best information and belief and as to any matters based upon information and belief, I believe them to be true.

(Executed within the United States) 28 U.S.C. §1746.

Executed on this 25th day of April, 2021.


_____
**D. MICHAEL MCBRIDE III**

**CERTIFICATE OF ELECTRONIC SERVICE**

I certify that on the day of filing, the foregoing document was electronically transmitted through this Court's ECF filing system to all counsel who have entered an appearance in this case and registered to receive ECF notification via electronic mail.


Micheal Salem


3668555.15

Page 37 of 37







**Mike McBride III**
Chair of Indian Law & Gaming Practice Group
500 Kennedy Building
321 South Boston
Tulsa, Oklahoma 74103-3313
Phone: (918) 592-9824 / Cell:  (918) 855-9549
E-mail:  mike.mcbride@crowedunlevy.com
*www.crowedunlevy.com*
(January 2021)

*Trial and appellate practice in federal, tribal and state courts as well as in arbitration proceedings with special emphasis in federal Indian law and policy, gaming law, service as general counsel / Attorney General to Tribes, business transactions, financing and complex federal litigation.   Other practice areas include economic development, business litigation, and professional/governmental liability issues.   Director and Shareholder of Crowe & Dunlevy, a full service law firm with offices in Oklahoma City, Tulsa and Dallas.*

*Peer review rated by: Chamber's U.S.A. (2009-present) in "Band 1" for "Native American Law" as well as the 2013 and 2015 "Star Individual", their highest rating; Best Lawyers in America for "Native American Law" and "Gaming Law" as well as 2013 Lawyer of Year for "Gaming Law";  Super Lawyers, Oklahoma by Law and Politics Magazines for "Native American Law, Gaming Law, Business Litigation and Political Law "; and "AV" rated lawyer in the Martindale-Hubbell legal directory.*

*Vice-President (2016-2020); Treasurer (2013-2015) and General Member (2005 to present) for International Masters of Gaming Law and Associate Editor, Gaming Law Review & Economics.   General Counsel on the Board of Directors (2008-2009), Member of National Board of Directors and Chair of Audit Committee (2009-2012), General Counsel to the Board of Directors (2008-09); Chair of Indian Law Section*

**Attachment A**
to Declaration of Mike McBride

D. Michael McBride III
Resume
Page 2 of 13

*(2006-08), and Vice-President-Tenth Circuit (2002-08), Federal Bar Association.* Commissioner to the Greater Tulsa Indian Affairs Commission (2013-2015). *Recipient of awards from the International Masters of Gaming Law, American Inns of Court, the Federal Bar Association, the Tulsa County Bar Association, the American Indian Chamber of Commerce, the Sovereignty Symposium and the Oklahoma Supreme Court.*

## EDUCATION

**University of Oklahoma College of Law**, 1993 (J.D., federal Indian law & commercial law concentrations)

**Oxford University, Queens College**, United Kingdom: European and Commercial Law Summer Program (1991)

**Trinity University**, San Antonio, Texas, 1989 (B.A., Philosophy & Political Science)

## INDIAN GOVERNMENTAL LAW & GAMING MATTERS

Service to over twenty federally recognized Indian tribal governments or their entities, including the following:

- **General Counsel to Peoria Tribe of Indians of Oklahoma**, **March 2018 to present.**

- **Special Litigation Counsel, Citizen Potawatomi Nation, 2014 to 2019.**

- **Attorney General and General Counsel**, **Seminole Nation of Oklahoma**, **1997 to 1998 and 2014 to 2018.**

- **General Counsel, Comanche Nation, 2012 to 2016.**

- **General Counsel, Comanche Nation Gaming Commission, 2012.**

- **Counsel, Kiowa Tribal Gaming Commission, 2011 to 2013.**

- **Counsel, Sac & Fox Nation and Sac and Fox Nation Enterprises (various times, 2000 to 2019)**

- **Counsel, Wyandotte Nation Gaming Commission, 2010 to 2016.**

- **Counsel, Otoe-Missouria Development Authority, 2010 to 2016.**

- **Special Counsel, Wampanoag Tribe of Gay Head (Martha's Vineyard, Massachusetts), 2009.**

- **Special Counsel, Osage Nation Congress, 2009 to 2015.**

- **General Counsel, Osage Nation, 2001 to 2002.**

- **Counsel, Osage Tribe Gaming Commission and Osage Tribal Council, 2000 to 2001.**

- **Counsel, Osage Nation Development Authority and Osage Nation Corporation, 1996 to 1997.**

- **Special Counsel, Cherokee Nation Tribal Council and Cherokee Nation, 1996, 2001 to 2004, 2009 to 2012.**

- **Counsel, Eastern Shawnee Tribe of Oklahoma, 2008 to present.**

- **General outside counsel, Eastern Shawnee Tribe of Oklahoma Gaming Commission, 2007 to 2017.**

- **General Counsel, Eastern Shawnee Tribe of Oklahoma Gaming Commission and Special Counsel to the Tribe, 1995 to 1996.**

- **Tribal Attorney & General Counsel, Sac & Fox Nation, 2006 to 2008.**

- **General Counsel, Iowa Tribe of Oklahoma Gaming Commission and special counsel to the Tribe's Chair and Business Committee, 2006 to 2010.**

- **Attorney General & General Counsel, Sac & Fox Nation, 2000 to 2005.**

- **Justice, Supreme Court of the Pawnee Nation, 2003 to 2012.**

- **General Counsel, Thlopthlocco Tribal Town, 2001 to 2019.**

- **Counsel, Ottawa Tribe of Oklahoma, 2003 to 2014.**

- **General Counsel, Seneca-Cayuga Tribe of Oklahoma, 2001 to 2003.**

- **Justice, Supreme Court of the Kaw Nation, 1999 to 2005.**

- **Special District Judge, Kaw Nation, 1995 to 1999.**

- **General Counsel, Delaware Tribe of Indians Housing Authority, 1997 to 2000.**

- **Counsel to Executive Branch, Chairwoman Ruey Darrow, Fort Sill Apache Tribe of Oklahoma, 1997 to 2001.**

- **Counsel to Membership Committee, Viejas Band of Kumeyaay** Indians **(near San Diego, California), 1995 to 1996.**

- **Counsel to Executive Branch, Principal Chief Bill Fife, Muscogee (Creek) Nation, 1995.**

Specific examples of significant litigation victories or service as expert witness on Indian law:

- Counsel of Record in the Supreme Court of the United States representing Amici Curiae the **Muscogee (Creek) Nation** and the **Seminole Nation of Oklahoma** in support of Petitioner in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc*., No. 96-1037 (certiorari granted, June 27, 1997, attended oral argument, January 12, 1998; reversed in favor of Kiowa Tribe, 523 U.S. 751 (1998)); *Brief Amici Curiae,* 1997 WL 528601.

- Lead trial and appellate counsel for **Thlopthlocco Tribal Town** in the United States District Court, Eastern District of Oklahoma, in *Thlopthlocco Tribal Town v. Bruce Babbitt, Secretary of Interior, (USA),* Case No. CIV-97-306-P; and on appeal to the United States Court of Appeals for the Tenth Circuit (2001 to 2003), supporting counsel (1997 to 2001).

- Counsel of record in the Supreme Court of the United States representing Amici Curiae **Thlopthlocco Tribal Town** and **Sac & Fox Nation** in support of Respondent, the Tribal Court in and for the Fallon Paiute-Shoshone Tribes and the Honorable Joseph N. Van Walraven in *Nevada v. Hicks*, No. 99-1994 (U.S. June 25, 2001).  Decision below: 196 F.3d 1020 (9th Cir. 2000), *cert. granted*, 121 U.S. 296 (2000), attended oral argument in February 2001; Decision:  533 U.S. 353 (2001).  *Brief Amici Curiae*, 2001 WL 57508.

- Expert Witness regarding federal Indian law and gaming in *L & R Resources, LC v. James J. Monaghan, individually and d/b/a Dynamic Gaming Solutions, Inc.; Katdady, Inc.; Lee Sutherlin; and C.J. Perme*, Case No. 4-00-CV00836 JMM, United States District Court, Eastern District of Arkansas, Western Division (2000 to 2001)

- Expert Witness regarding Indian law and legal malpractice in support of the defense in *Raymond Friedlob as Receiver for Alpine Mutual Fund Trust v. the Kiowa Tribe of Oklahoma and Gary Pitchlynn, Esq.* Case No. CJ-96-32, Caddo County District Court, State of Oklahoma, settled after my deposition and prior to trial (2000)

- Expert Witness regarding Indian law and legal malpractice for the defense in *Raymond Friedlob as Receiver for Alpine Mutual Fund Trust v. the Comanche Tribe of Oklahoma, Comanche Enterprises and Milton Sovo, Campen USA, Inc., a Wyoming Corporation, and Nathan Young, Esq., John E. Ledge and Charles E. Campen,* Case No. CJ-96-82, Grady County.

- Retained and designated as expert witness by the Chief Judge regarding federal Indian law and Indian gaming for all defendants in *United States v. Garza, et. al.,* No. DR-04-CR-986-AML (U.S. District Court, W.D. Texas, Del Rio Division) (matter involving the Traditional Kickapoo Tribe of Texas).

---

## BAR LEADERSHIP, AWARDS, HONORS & ACTIVITIES

### INTERNATIONAL MASTERS OF GAMING LAW

President's Cup Award, September 2011 from IMGL President Tony Coles of Jeffrey Green Russell, London, at the Autumn meeting in Vienna, Austria, for outstanding accomplishments and service to the organization.

One of two Regular Members--Oklahoma.  Nominated for membership in February 2004; elected by peer review and inducted into membership April 2005. The International Masters of Gaming Law (IMGL) is a non-profit association of attorneys, gaming regulators and gaming executives dedicated to the education, advancement of the gaming law profession and exchange of professional information concerning the local and global practice and development of all aspects of gaming law.  General membership is limited to two per state within the United States and two per country outside the United States; http://www.gaminglawmasters.com.

- Chair, Membership Committee (2010 to 2014) and ex-officio member of IMGL Executive Committee

- Chair, Internet Website Committee (2005-2009) (develop and update website for scholarship and content)

- Associate Editor, **Gaming Law Review & Economics** (2006 to the present)

Invited chapter author, "Gaming in Oklahoma," (chapter in International Casino Law, revision of book to be published by the Gaming Law Review and International Masters of Gaming Law (4th ed. 2007)


### THE HISTORICAL SOCIETY OF THE TENTH JUDICIAL CIRCUIT

Charter Lifetime Member (2004), Board of Directors, elected to two terms (2003-2008); serving the United States Court of Appeals for the Tenth Circuit comprised of circuit and district judges and practitioners across the six states Circuit


### FEDERAL BAR ASSOCIATION

**Member, National Board of Directors**, 2010-12
Chair of national Audit Committee and Liaison to Board of Directors, 2010-11

**General Counsel** for the National Board of Directors, 2008-09

    **Indian Law Section** (largest Indian law organization in the United States)

- **Recipient: Distinguished Service Award**, April 2, 2009, Santa Fe, NM

- **Chair**, Indian Law Section (Aug. 2006-Sept. 2008)

- **Deputy Chair**, Indian Law Section (2005-06)

- **Board Member**, National Indian Law Section (2000-present)


    **National Vice-President for the Tenth Circuit** (September 2002, term: 2002-2004; 2004-06; 2006-08)


    **National Officer Responsibilities**

- **Task Force Member**: Chapters and Divisions Reorganization (2006-07)

- **Officer Nominations Committee**: (2004-07)

- **Task Force Member**: New Mexico Chapter formation and reactivation (2004)

- **Member,** Awards Committee for the Earl Kintner Award for Distinguished Service (2004)

- **Lifetime Fellow,** Foundation of the Federal Bar Association (Formal induction in September 2003)

    ♦ National Officer Nominating Committee Member (2005-06)
    ♦ National Budget Committee member 2002-06
    ♦ National Membership and Admissions Committee member 2003-06

- **National Council Member** (2001-2008)

- **Member**, National Professional Ethics Committee (2001-2003)

- **Member**, National Membership Board (2003-04)

- **Judge,** National Chapter and Section Newsletter Competition (2002)

- Northern & Eastern Oklahoma Chapter:

    ♦ **President** (2000-2001);
      In September 2001, the Northern and Eastern Oklahoma Chapter received the National "Get-a-Member" award for the greatest percentage annual membership growth for the chapter category.
    ♦ **Treasurer** (1995-1999)

### AMERICAN BAR ASSOCIATION

**Oklahoma Fellow Member:  ABA Foundation** (2008 to present)

**Member:  ABA Standing Committee on Judicial Independence**
Appointed by ABA President-Elect Dennis Archer, August 2003-2006; Chair, "Study Group on Pre-Judicial Education" 2003-2006 producing an ABA White Paper Report.

**Member:  ABA Commission on Law & Aging**
Appointed by ABA President-Elect Karen Mathis, for one year term, August 2006-2007

**Member**:

- **General Practice, Solo & Small Firm Division**

- **Law Practice Management Section**

- **Natural Resources, Energy & Environmental Law Section** (Native American Resources Committee)

*Other ABA Service*

- **Vice Chair for Membership**, Section of Natural Resources, Energy and Environmental Law, Committee for Native American Natural Resources (1999-2000)

- **Planning Committee Member**, Section on Natural Resources, Energy and Environmental Law, Native American Resource Committee, *Environmental and Development in Indian Country Conferences* (1997-2001)

**A**MERICAN **I**NDIAN **C**HAMBER OF **C**OMMERCE

- Member and pro-bono General Counsel to State Chamber.

- **Recipient**, 2005 Business Advocate of the Year Award, AICCO Annual Awards Banquet, August 18, 2005

- Member, Board of State Chamber Board of Directors (2015 to present)

**A**MERICAN **C**OUNSEL **A**SSOCIATION

- Member and Tulsa Representative (nominated and confirmed 1999 to present)

- National Board Member (elected to three-year term (2003-06) at annual meeting in San Francisco, Aug. 11, 2003)

- National Membership Committee (Appointed Sept. 2006 to present)

**O**KLAHOMA **B**AR **A**SSOCIATION

- Vice Chair, **Diversity Committee**, approximately 60 members (2002)

- **General Practice, Solo & Small Firm Section**: Treasurer (2001-2002); Secretary (2002-03); Chair-Elect (2003-04); Chair (2004-05)

- **General Practice Section:** Chair (1998-99); Chairperson-Elect (1997-98); Treasurer (1996-97)

- **Indian Law Section**: Secretary (1994-95), Treasurer, (2000-01); Secretary (2001-02); Chair -Elect (2002-03); Chair (2003-04) (worked on an initiative to encourage the state Board of Bar Examiners to include Indian law on the Oklahoma Bar Exam and raised funds for annual bar exam scholarship awarded to three students from Oklahoma law schools demonstrating interest in Indian law, academic merit and financial need).

- Member, **Strategic Planning Committee** (2000-2002)

- Member, **Civil Procedure Committee** (1999-2001)

- Director (At-Large), **Young Lawyers Division** (1998-99) (elected to second term October, 1999-2001) (Chair person, Indian Handbook Committee, 1999-2000; Vice Chairperson, 1998-1999) (Coordinator of Violence against Women and Families in Indian Country pamphlets for distribution to tribal government complexes and tribal courts. The pamphlets give details of federal laws available to protect people who suffer domestic violence in Indian country and resources for counseling and help.).

- Member, **"Five Tribes" 1947 Act Congressional Policy Review Committee of the Real Property Section** (2000) (provide review, analysis and recommendations at request of United States Senator James Inhofe).

- Member, **Long Range Planning Committee** (1997-1999) (Participant, Long Range Planning Retreat, Oklahoma State University, Stillwater, OK, July, 1999)

### OKLAHOMA BAR FOUNDATION

Fellow, 1999-present

### TULSA COUNTY BAR ASSOCIATION

- **Special Centennial Recognition Award,** August 2003 Annual Awards Luncheon

- **At-Large Director**  (2003-05)

- **Director** (2002-03)

- **Chair**, Diversity Committee (2002-03) Chaired special Diversity Event recognizing lawyers of color from 100 years of Tulsa history on January 17, 2003; co-sponsored with the Hudson-Hall-Wheaten Inn and Johnson-Sontag Inn, American Inns of Court

- **Member**, Membership Committee (2001-2002)

- **Alternate Delegate** to the OKLAHOMA BAR ASSOCIATION House of Delegates (1999-2003)

- **Program participant**:  (i) Ask a Lawyer and law week programs; and (ii) lawyer referral service (1995 to 2005).

- **Vice-Chair**, Long Range Planning Committee (1997-98) member (1996-99)

- **Member**, Awards and Nominations Committee (1996-97)


OKLAHOMA TRIAL LAWYERS ASSOCIATION (Member, 1995 to present)

- **Member**, Board of Directors (1996-97)

- **State Director of Membership** (1996-97)

NATIONAL NATIVE AMERICAN BAR ASSOCIATION (1993- 1997; 2001-present)

National Board Member (2016 to 2018)
Served as a judge for the National Native American Law Students Association Moot Court Competitions at Oklahoma City University (1996, quarter finals, semi-finals rounds) and (1997, final round judge)

AMERICAN INNS OF COURT, Tulsa, OK

**Recipient:  2003 John S. Athens Leadership & Ethics Award**, American Inns of Court annual awards dinner, May 20, 2003

**Barrister Member** (2002 to 2006) Johnson-Sontag Chapter

**Barrister Member** (1999 to 2002), Council Oak Chapter

**Associate Member** (1995-99), Council Oak Chapter

<u>SOVEREIGNTY SYMPOSIUM, INC.</u>   (An educational entity founded by the Oklahoma Supreme Court)

**Board of Directors Member** (2007 to 2014)

**Faculty presenter** at conferences (1995-present).

Served as one of five writing competition judges for the annual national competition on Indian law topics (1997)

## COURT MEMBERSHIPS

Admitted to practice before the following <u>United States Courts</u>:

- Supreme Court of the United States of America (1997)

- United States Court of Appeals for the Tenth Circuit (1997)

- United States Court of Appeals for the Seventh Circuit (2011)

- United States Court of Federal Claims (1994)

- United States District Court for the Western District of Oklahoma (1999)

- United States District Court for the Eastern District of Oklahoma (1997)

- United States District Court for the Northern District of Oklahoma (1994)

Qualified Federal panel lawyer: Oklahoma Habeas Corpus Death Penalty Post-Capital Conviction Relief (1997)

Criminal Justice Act panel lawyer qualified to accept appointments from the United States District Court, Northern District of Oklahoma (1996 to 2003)

Admitted to practice before the following federally-recognized <u>Indian Tribal Courts</u>:

- The Kickapoo Tribe of Oklahoma (2010)

- The Cherokee Nation of Oklahoma (1995)

- The Chickasaw Nation (1996)

- The Sac & Fox Nation (2000)

- The Osage Nation (2008)

- The Comanche Nation of Oklahoma (2012)

- The Ho-Chunk Nation  (2010)

- The Seminole Nation of Oklahoma (2014)

- Courts of Indian Offenses for the Eastern and Western Districts of Oklahoma (1994)

- Courts of Indian Offenses (Appellate Division) for Oklahoma (1994)

- Duck Valley Indian Reservation for the Shoshone and Paiute Tribes of Nevada & Idaho (1993)

- Admitted to practice before the Oklahoma Supreme Court and all Oklahoma District Courts (1993)

## COMMUNITY LEADERSHIP

- **Trustee, Pawnee Nation College Board of Trustees**, Institution of higher learning serving the Pawnee Nation and surrounding Native American community.  (2011 to 2016)

- **President**, Tulsa Chapter, Trinity University Alumni Association (2009-2012)

- **Board Member**, Tulsa Indian & Powwow Club, Inc., Tulsa, OK, non-profit corporation organizing native cultural events in Tulsa including the annual Tulsa Powwow and the annual Day-Ahn-Day runs (2010 to present)

- **Chair**, Brooktowne Neighborhood Association, Alert Neighbors Committee (2010-2014)

- **Board Member**, Simon Estes Educational Foundation, Tulsa, OK, non-profit foundation that provides scholarships to graduating Tulsa and surrounding area high school students of diverse backgrounds with outstanding

achievements demonstrated financial need (2004 to 2008); Secretary of the Board of Directors and member of Executive Committee (2005 to 2008).

- **Nominating Committee Member,** American Indian Chamber of Commerce 2004.

- **Pro-bono General Counsel**, Tulsa Workforce Investment Board, provide legal advice to job creation and economic development entity comprised of over thirty private sector and public business leaders and local government representatives (2002 to 2004)

- **Chair,** Tourism and Local Attractions Committee, American Indian Science & Engineering Society (AISES), annual national conference Tulsa, November 5-9, 2002 (May 2002 to November 2002)

- **Member**: Leadership Tulsa, Class of XXVI (1999-2000) (Community leadership training & service on non-profit boards)

- **Member Planning Board**, "Wild Brew" Committee for annual August fund raising event benefiting the Nature Conservancy (2000-2004) and the Sutton Aviary Institute (2005 to 2014)

- **Pro-bono legal counsel**, Florence Park South Neighborhood Association, Tulsa, Oklahoma (1998 to 2004);  elected Zoning Officer (2000-2001)

- **National Alumni Class Representative**, Class of 1985, The Orme School, Mayer, Arizona (Co-ed, college preparatory boarding school, fund raising and alumni relations) (1995 to 2005)

- **Board Member**, Brooktowne Neighborhood Association (a private planned community), Tulsa, Oklahoma (2004 to 2007); Chairman of Long Range Planning Committee.

## PERSONAL INFORMATION

**Born:** 1965; **Hometown**:  Bartlesville, OK; fourth generation Oklahoman.